UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-10465
_____

JUAN SORIA,

Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____
March 16, 2000

Before EMILIO M. GARZA, DeMOSS, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Petitioner Juan Soria (Soria), convicted of capital murder in Texas and sentenced to death, requests from this Court a Certificate of Appealability (COA) pursuant to 28 U.S.C. § 2253(c)(2). Soria raises numerous arguments on appeal, including denial of equal protection, denial of an impartial jury, and ineffective assistance of counsel. Finding that Soria has not made a substantial showing of the denial of a constitutional right, we deny the COA.

I.   BACKGROUND

By way of indictment, a Tarrant County grand jury charged Soria with the capital offense of murdering Allen Bolden, while in the course of committing and attempting to commit the offenses of

robbery and kidnaping, and the offense of murdering Allen Bolden.

A jury found Soria guilty of capital murder.  After a separate

punishment hearing, the jury answered affirmatively the two special

issues submitted pursuant to Article 37.071 of the Texas Code of

Criminal Procedure.[1]  As a result of the jury's findings, the trial

court assessed punishment at death by lethal injection.

On direct appeal, the Texas Court of Criminal Appeals

initially affirmed the conviction but reformed the sentence to life

imprisonment, holding that the evidence was insufficient to support

the jury's finding that Soria would be a continuing threat to

society.  *Soria v. State,* No. 69,679 slip op. (Tex.Crim.App. June

8, 1994) (per curiam) (unpublished).  In an opinion on the State's

motion for rehearing, the Court affirmed Soria's conviction and

reinstated the death sentence.  *Soria v. State,* 933 S.W.2d 46

(Tex.Crim.App. 1996), *cert. denied*, 117 S.Ct. 2414 (1997).

Soria, through counsel, filed a state application for a writ

of habeas corpus.  After a "hearing" by affidavit, the trial court

entered findings of fact and conclusions of law recommending that

---

[1]  The trial court submitted the following questions to the jury in the punishment charge:

> Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

2

habeas relief be denied.  The Court of Criminal Appeals denied relief, expressly adopted the trial court's findings, excepting, without explanation, conclusions of law two, twelve, and thirteen.

Soria, through counsel, filed the instant federal petition for a writ of habeas corpus.  The respondent answered the petition and moved for summary judgment.  After hearing oral argument on the respondent's motion, the district court denied relief in a written order.  Soria moved for a COA, which was denied by the district court.  Soria now requests a COA from this Court.

II.  STANDARD OF REVIEW

Soria filed his section 2254 application for habeas relief on January 15, 1999, which was after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA).  His application therefore is subject to the AEDPA.  *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 2068 (1997).  Under the AEDPA, a petitioner must obtain a COA.  28 U.S.C. § 2253(c)(2).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 3394 n.4 (1983) (citation and internal quotation marks omitted).  Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in

making this determination.  *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

III. ANALYSIS

Soria asserts numerous grounds of error in his application for COA.  Each will be addressed in turn.

A.   EQUAL PROTECTION CLAIM

Relying on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712 (1986), Soria asserts that the state trial court's refusal to require the prosecutor to provide racially neutral explanations for peremptorily challenging two Hispanic venire members resulted in a violation of the Equal Protection Clause of the Fourteenth Amendment.  To evaluate a *Batson* claim, we look to the following framework: (1) the petitioner must make a *prima facie* showing that the prosecutor exercised his peremptory strikes on the basis of race;  (2) the burden of production then shifts to the prosecutor to articulate a race-neutral reason for challenging the venire member; and (3) finally, the trial court must decide whether the petitioner has sustained his burden of proving purposeful discrimination.  *Thompson v. Cain,* 161 F.3d 802, 810-11 (5th Cir. 1998).

To establish a *prima facie* case, Soria was required to demonstrate that the prosecutor exercised peremptory challenges against minority venire members--in this case Hispanics[2]--and that

---

[2]   In *Batson,* the Supreme Court required that the party objecting to the challenges be of the same cognizable race as the excluded venire members.  476 U.S. at 96, 106 S.Ct. at 1723.  The Supreme Court later abandoned this requirement.  *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 1366 (1991).

4

the relevant circumstances raised an inference of purposeful discrimination. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. An inference may be drawn from such circumstances as a "pattern" of strikes against minority venire members and the remarks made by a prosecutor during voir dire. *Id.* at 96-97, 106 S.Ct. at 1723.

In the instant case, the trial court's statement that it did not "see a pattern or a systematic exclusion" and its refusal to require the prosecutor to articulate his reasons for the strikes should be treated as a finding that Soria failed to make a *prima facie* case of discrimination under *Batson.*[3]

On direct appeal, the Texas Court of Criminal Appeals provided the following factual analysis upholding the trial court's finding that no *prima facie* case was made:

> Eighty-four (84) veniremembers were examined by the parties during the selection process. Of these, 25 were excluded for cause on motion of one or the other party, and 13 were excused by the trial judge, either on agreement of the parties, due to a previously unclaimed exemption, or for reasons of hardship. Two of these 38 prospective jurors were hispanic people, but there is no suggestion that either was excluded in violation of *Batson . . . .*
>
> Of the 46 remaining veniremen, three were hispanic people. Two of these were struck by the State. The other was not challenged by either party, and so served on the jury. Given the proportion of hispanic people on the venire and comparing it with the proportion of hispanic people struck by the prosecutor, the

---

[3] *See, e.g., United States v. Branch,* 989 F.2d 752, 755 (5th Cir. 1993) (explaining court's statement that "I don't think you have the absolute right to have every black on the panel sit on the jury" would be treated as a finding that appellants failed to make a *prima facie* case of discrimination).

5

following observations seem pertinent to the issue of deliberate racial discrimination.

The State used 16 peremptory challenges during the selection process. Forty-six (46) people were potential targets of these strikes. Three were hispanic. The prosecuting attorney actually struck two hispanic people and 14 nonhispanic people. This means that he used 12.50 % of his peremptory strikes against members of an identifiable ethnic group comprising only 6.52 % of the eligible venire. In other words, he struck hispanic people at almost twice the rate such people would have been eliminated by random exclusion.

Nevertheless, had the prosecutor struck one less hispanic person, the rate of exclusion (6.25 %) would have been nearly the same as if random. Thus, but for a single peremptory strike out of the 16 actually exercised by the State, no inference of intentional discrimination would be statistically supportable.

*     *     *

We have not been asked to consider anything but the foregoing statistics. It should be noted, however, that the *voir dire* examination of the two hispanic people who were struck by the State does not appear to differ significantly as regards any implication of racial bias from that of the hispanic person who actually served as a juror. In this regard, [Soria] has not suggested any such basis nor referred us to any portion of the record which he alleges to disclose racial discrimination by the prosecuting attorney.

*     *     *

A deviation from the norm of but a single strike simply does not so clearly raise an inference of racial discrimination that a factfinding to the contrary must be disturbed on appeal. Although, in this case, one peremptory challenge amounts to twice the number expected from random selection, it also represents but a single increment greater than

6

random selection would produce under ideal circumstances. Thus, . . . this case does not clearly raise an issue of purposeful discrimination, since little can legitimately be inferred from an unexpectedly high rate of strikes when the absolute number of those strikes is very low. In these circumstances we cannot fairly conclude that the trial judge erred to think the number and circumstances of peremptory challenges against hispanic veniremembers did not actually present a *bona fide* issue of racial discrimination.

The state court's determination that Soria failed to make a *prima facie* showing is a factual finding. *See Branch,* 989 F.2d at 755. Therefore, in reviewing this finding, we must accord it a presumption of correctness, which can only be rebutted by "clear and convincing evidence." *Thompson,* 161 F.3d at 811; § 2254(e)(1).

Citing *Batson,* Soria asserts that "the trial judge reviewed the evidence for 'purposeful discrimination,'" as opposed to an *inference* of purposeful discrimination. Soria does not provide a cite to the record to support his contention that the trial court erroneously held him to a higher standard. Our independent review of the record reveals that, in fact, the trial court found "there was no pattern or systematic exclusion of persons of the same ethnic background." Contrary to Soria's assertion, the trial court's finding comports with the Supreme Court's requirements as memorialized in *Batson.* Indeed, the Supreme Court, by way of example, opined that "a `pattern' of strikes against black jurors included in the particular venire might give rise to an *inference* of discrimination." 476 U.S. at 97, 106 S.Ct. at 1723 (emphasis added).

Soria further argues that "by refusing to put the prosecutor

7

to his burden under *Batson*, the trial judge denied petitioner of the very evidence which would be used to establish purposeful discrimination." This argument indicates a fundamental misunderstanding of the burden-shifting framework crafted in *Batson.* "The `shifting burden' described in the *Batson* framework is one of production only." *United States v. Bentley-Smith,* 2 F.3d 1368, 1373 (5th Cir. 1993). The party asserting the claim of purposeful discrimination always shoulders the ultimate burden of persuasion. *See id.* More important, *Batson* makes clear that a petitioner must establish a *prima facie* case *before* a prosecutor is required to come forward with a neutral explanation for the challenges. 476 U.S. at 96-97, 106 S.Ct. at 1723. Once a *prima facie* case is established, the reason proffered by the prosecutor will be deemed race neutral unless a discriminatory intent is inherent in such explanation. *Bentley-Smith,* 2 F.3d at 1373.

Soria does not now point to any evidence establishing a *prima facie* case of purposeful discrimination during voir dire other than the fact that two Hispanics were peremptorily challenged. Although a peremptory challenge based on the race of even one minority venire member constitutes a violation of *Batson,* "a defendant must prove discrimination by more than the sole fact that the minority venire-person was struck by peremptory challenge." *Branch,* 989 F.2d at 755.[4] In light of the confidence placed in trial judges to

---

[4] In *Branch,* the prosecution struck one of two minority venire members. 989 F.2d at 754-55.

make this determination,[5] we cannot conclude that Soria has overcome the presumption of correctness afforded the state court's finding. Soria's failure to rebut the state court's factual finding that a *prima facie* case of purposeful discrimination was not made effectively precludes him from making a substantial showing of the denial of a federal right.

B. REFUSAL TO REOPEN VOIR DIRE

Soria contends that his right to an impartial jury under the Sixth and Fourteenth Amendments was violated when the trial court refused to reopen the voir dire questioning of a prospective juror to determine whether he had a bias against Soria. "The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors." *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036 (1975) (citation and internal quotation marks omitted). "Qualified jurors need not, however, be totally ignorant of the facts and issues involved." *Id.* at 800, 95 S.Ct. at 2036.

At the conclusion of voir dire, defense counsel requested that it be reopened as to Juror Ramus for the "limited purpose of inquiring, pursuant to the requirements of Article 35.16(10), as to whether or not, from hearsay or otherwise, there is established in his mind such a conclusion as to the guilt or innocence of the Defendant that would influence his verdict." In support of that motion, defense counsel offered the following testimony of the court's bailiff, who was coordinating the scheduling of the

---

[5] *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

9

prospective jurors.

Juror Ramus phoned the bailiff, apparently after remembering that during voir dire he had been asked whether he recalled hearing about this murder case prior to being called as a prospective juror.  He informed the bailiff that he recalled hearing, while working on a construction project at a savings bank the previous summer, about a woman who worked at that bank whose son, grandson, or some male relative had been murdered.  However, Ramus could not remember the names involved.  The bailiff further testified that it had been determined the victim's mother was working at that bank during that time.  The trial court denied the motion to reopen voir dire.

On direct appeal, the Court of Criminal Appeals found that:

> further questioning under article 35.16(a)(10) was not indicated for this purpose in the present context because the information communicated to the bailiff did not raise an issue that Ramus had established in his mind "a conclusion as to the guilt or innocence of the defendant."  The fact that he may have overheard casual conversation about the incident months earlier, without any mention of [Soria's] name or other intimation that [Soria] might be responsible for the crime, does not, therefore, suggest a challenge for cause which [Soria] was prevented from fully exploring.

Soria now asserts that "there was a duty incumbent upon the trial court . . . to examine whether Mr. Ramus, having remembered substantial contact with the victim's mother at her place of business, held a bias against the defendant on the issue of guilt or on the issue of punishment."  Soria's assertion that Juror Ramus had substantial contact with the juror is not supported by the

bailiff's testimony. More important, as quoted above, the state court found that the juror may have overheard casual conversation about the incident months earlier, without any mention of Soria's name or other intimation that Soria might be responsible for the crime. Soria has not rebutted these findings with clear and convincing evidence. Thus, we must view his claim of denial of an impartial jury with these facts in mind.

In *Andrews v. Collins,* 21 F.3d 612 (5th Cir. 1994), we addressed a similar claim. In that case, the petitioner contended that the state court erred in refusing to reopen voir dire prior to trial to determine whether a juror, who had been a distant relative of the victim, was biased. More specifically, a daughter of the juror in question had been married to the victim's grandson, who was deceased at the time of trial.

In that case, we construed the petitioner's argument to be that, as a matter of law, bias must be imputed to the juror. We rejected the petitioner's argument, explaining that, during voir dire, the prospective juror stated that he did not know of any reason why he could not be a fair and impartial juror and that the record contained no evidence indicating that the juror's "tenuous relationship" had any effect on the proceedings.[6] *Andrews*, 21 F.3d

_____

[6] We also took into consideration other circumstances that are not applicable to the instant case: (1) the juror was never directly related to the victim, and the juror's daughter's relationship with the victim's grandson did not exist at the time of trial; (2) the petitioner did not allege that the grandson was alive when the victim was killed; (3) the record contained no evidence indicating that at the time of trial the juror knew he had at one time been related to the victim.

11

at 620-21.  Under those circumstances, we refused to impute bias to the juror.[7]

In the instant case, like the juror in *Andrews*, Juror Ramus stated during voir dire that he did not "know of any reason whatsoever that [he] couldn't be a fair and impartial juror in this case."  He further stated that he had no opinion or conclusion respecting the outcome of the case and that he could be fair and impartial.  When asked whether he had read or heard anything about this case, Juror Ramus replied, "Not that I remember.  I read the paper every morning, but it doesn't stick.  *It seems like I remember it, but I don't remember anything about it*."  (emphasis added).[8]  Additionally, as in *Andrews*, there is no indication that the information Juror Ramus overheard had any effect on the proceedings.

In light of Soria's failure to rebut the state court's finding

---

[7]  We cited *Jones v. Butler*, 864 F.2d 348 (5th Cir. 1988), as support for our conclusion that bias should not be imputed to the juror.  *Andrews*, 21 F.3d at 621.  In *Jones v. Butler*, the petitioner argued that a juror was biased, and, thus, the trial court should have excused her for cause.  864 F.2d at 361-62.  In that case the prospective juror "had lived near the victim and knew her by sight, had visited the funeral home to view her body" and had previously worked at a state prison and for a doctor who testified for the state in that case.  *Id.* at 362.  We held that the juror's statement that her prior jobs and her curiosity regarding the victim would not prevent her from being impartial supported the trial court's denial of the defense challenge for cause.  *Id.*

[8]  When asked why he felt that he could be fair and impartial, Juror Ramus responded "[b]ecause I don't know anything about it.  And I'd like to think that I was a fair and impartial person."  When asked whether he had a problem deciding the case "strictly limited to the evidence that is introduced in this case on which you are sitting as a juror," Juror Ramus responded "[n]o."

12

that Juror Ramus simply overheard casual conversation regarding the killing without reference to Soria's guilt, he cannot show that he was denied his right to be tried by an impartial jury. Accordingly, he has failed to make a substantial showing regarding the denial of a federal right with respect to this claim.

C. LIMITATION OF VOIR DIRE REGARDING SPECIAL ISSUE ONE

Soria argues that his rights to a fair trial and an impartial jury under the Sixth and Fourteenth Amendments were violated by the trial court's refusal to allow Soria to question venire member Pollard regarding his views on the first special issue at the punishment phase. In reviewing claims challenging the trial court's limitations on voir dire, we are limited, of course, to such limitations that rise to the level of a constitutional violation. *Herman v. Johnson,* 98 F.3d 171, 174 (5th Cir. 1996). Trial judges are afforded much latitude in determining how voir dire should be conducted. *Id.*

Specifically, Soria attempted to ascertain whether venire member Pollard thought that a finding of intentional conduct at the guilt phase would automatically satisfy the requirement in special issue one that the conduct was committed with the reasonable expectation that the death of the deceased or another would result.[9] As such, Soria argues, the limitation on voir dire

---

[9] As set forth previously, the trial court submitted the first special issue as follows: "Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?"

13

deprived him of the ability to determine whether the venire member could follow the law and whether the venire member was excusable for cause, as well as the ability to intelligently exercise a peremptory challenge.

We addressed a very similar claim in *Herman,* 98 F.3d at 174. In that case, during voir dire, the trial court refused to inform the petitioner which instruction regarding the evaluation of mitigating evidence would be given to the jurors at the penalty phase. This Court stated that the trial court "was soundly within his discretion when he refused to allow detailed questioning of veniremen on the legal standard they would use to evaluate mitigating evidence." *Id.* We are persuaded that Soria's inquiry-- whether intentional conduct automatically satisfies the latter part of the first special issue--falls into the same category as the questioning in *Herman.* Thus, we believe that the trial court's refusal to allow Soria to make that inquiry was well within its discretion.

Moreover, Soria exercised a peremptory challenge against Pollard. In *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 2278 (1988), the Supreme Court held that a trial court's refusal to remove a biased venire member for cause did not violate the defendant's Sixth Amendment right to an impartial jury because he exercised a peremptory strike against the challenged venire member. The Court explained that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment

14

was violated." *Id.* As such, because Pollard did not sit on Soria's jury, Soria is precluded from making a substantial showing of the denial of a federal right with respect to this claim.

D.   CHALLENGES FOR CAUSE

Soria next argues that the trial court's refusal to excuse two jurors for cause violated his rights under the Sixth and Fourteenth Amendments. The standard for determining when a venire member may be excluded for cause is whether the prospective "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852 (1985) (internal quotation marks and footnote omitted). A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness. *Jones v. Butler,* 864 F.2d 348, 362 (5th Cir. 1988).

More specifically, Soria asserts that venire members Dunlap and Curle should have been excused for cause based on their inability to consider a life sentence if Soria was convicted of capital murder. Soria further asserts that "fundamental fairness requires jurors who could not impose a sentence of life imprisonment in cases where a defendant may be paroled [must] be excused." As the Court of Criminal Appeals found, venire member Dunlap "testified that he would be able to follow instructions in a murder case not to consider the operation of parole laws and that he would not adjust the sentence to account for the possibility of parole." *Soria*, 933 S.W.2d at 63. Venire member Curle likewise

15

indicated to the court during voir dire that he would not consider parole in answering the punishment issues:

> [Court]: . . . Both sides have indicated to you that the punishment for capital murder is life in prison or the death penalty, depending on how the questions are answered.
>
> And I believe one side or the other, and I can't remember which side it was, talked to you about that you could not consider parole in answering questions or determining what punishment to assess. You understand that?
>
> [Curle]: Uh-huh.
>
> [Court]: So--and I believe you answered affirmative[ly] that that would not enter into your consideration in setting your punishment or in answering any of these questions; is that correct?
>
> [Curle]: Yes, sir.

*Id.* (brackets and ellipsis in opinion).

The record reveals that these two venire members' views regarding parole would not prevent or substantially impair the performance of their duties as a juror. *See Wainwright v. Witt,* 469 U.S. at 424-30, 105 S.Ct. at 852-55. Soria has not rebutted with clear and convincing evidence the trial court's implicit factual finding that the prospective jurors could follow the court's instructions.

Soria's assertion of error extends beyond these two venire members, however. Specifically, Soria asserts that "the failures of the Texas capital sentencing scheme to accurately inform the jury concerning parole of a defendant, convicted of capital murder and sentenced to life, operated to deny petitioner his guarantee of a fundamentally fair trial." Although it is unclear, Soria

16

apparently challenges as unconstitutional the Texas law that precluded the trial court from instructing his jury regarding the parole laws in Texas.

Soria admits, however, that he did not seek from the trial court an instruction on the parole laws of Texas. Indeed, Soria did not object to the trial court's instruction to the jury "not to consider or discuss any possible actions of the Board of Pardons and Parole or the Governor nor how long this defendant will be required to serve on a sentence of life imprisonment." The Texas Court of Criminal Appeals deems objections to the jury charge forfeited unless a contemporaneous objection is made at the time the charge is prepared. *See Cannon v. State,* 668 S.W.2d 401, 404 (Tex.Crim.App. 1984). Thus, the contemporaneous objection requirement, an independent and adequate state procedural rule, would foreclose review of Soria's claim in state court. *Muniz v. Johnson,* 132 F.3d 214, 220-21 (5th Cir. 1998).[10] The claim therefore is procedurally barred from our review in that Soria offers no argument demonstrating cause for the default and prejudice resulting therefrom. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 2565 (1991).

Even if the claim was not procedurally barred, because our precedent makes clear that the Constitution allows Texas "to keep

---

[10] *See also Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997) (explaining that "[a] procedural default also occurs when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred" (internal quotation marks and citation omitted)).

17

from juries evidence or instructions of parole eligibility,"[11] this claim would afford Soria no relief. As he acknowledges, this Court has specifically held that a capital murder defendant is not constitutionally entitled to question venire members regarding their views on Texas parole law. *King v. Lynaugh,* 850 F.2d 1055 (5th Cir. 1988) (en banc). Notwithstanding that en banc opinion, Soria looks to the Supreme Court's opinion in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187 (1994), which was decided after *King v. Lynaugh,* but prior to Soria's direct appeal becoming final.

In *Simmons,* the Supreme Court held that if the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires the sentencing jury to be informed the defendant is ineligible for parole. 512 U.S. at 156. This Court has explained that *Simmons* requires a jury to be informed about a defendant's parole ineligibility only when (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole. *Allridge*, 41 F.3d at 222.

The instant case is controlled by *Allridge.* Soria, like the petitioner in *Allridge*, would have been eligible for parole under Texas law if sentenced to life imprisonment. Accordingly, Soria's reliance on *Simmons* to demonstrate that the Texas capital sentencing scheme denied him a fair trial is unavailing. *See id.*

---

[11] *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994) (citing *Rose v. State,* 752 S.W.2d 529, 534-35 (Tex.Crim.App. 1987)).

18

Soria therefore has not made a substantial showing of the denial of a constitutional right.[12]

E.     LIMITATION OF VOIR DIRE ON SPECIFIC MITIGATING FACTORS

The next issue is whether the trial court's restrictions on the phrasing of certain voir dire questions regarding the consideration of mitigating evidence violated Soria's right to an impartial jury.  During voir dire, Soria attempted to pose questions in the following form: "No matter what the other evidence would show, could you consider [evidence such as youth or voluntary intoxication] as a mitigating factor in setting punishment."  The state objected, and the trial court sustained the objection, concluding that such phrasing of the question constituted an attempt to bind the prospective juror regarding his or her position on the evidence.  On direct appeal, the Court of Criminal Appeals agreed with the trial court:

> We . . . hold the trial court in the instant case did not abuse its discretion in ruling that the form of appellant's questions was improper.  Modifying each question by asking, "no matter what the other evidence showed" could be construed as an attempt to bind the venireperson to say that they would view the specified evidence "in mitigation" or "as a mitigating factor" under any circumstances, which would therefore include the circumstances involved in the instant case.

*Soria,* 933 S.W.2d at 65.  We are not persuaded that the trial court abused its considerable discretion in finding that the questions

---

[12]  Additionally, Soria exercised peremptory challenges against both Dunlap and Curle.  As previously set forth in section C of this opinion, peremptorily striking the challenged venire members from the jury is fatal to his claim that his right to an impartial jury was violated.  *See Ross,* 487 U.S. at 88, 108 S.Ct. at 2278.

19

posed by Soria constituted an attempt to improperly commit the prospective jurors to a certain view regarding mitigating evidence anticipated to be presented in his case.

More important, as the Court of Criminal Appeals acknowledged, Soria was not prevented from rephrasing the questions. *Id.* Indeed, the trial court expressly informed Soria that it would allow him to phrase the question to a prospective juror as follows: "Can you consider [for example] the age of the Defendant in deciding on punishment?"

Citing *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954 (1978), Soria complains that the trial court's question reveals whether a potential sentencer would *consider* evidence of youth, but not whether the sentencer would consider youth *mitigating* evidence. Thus, he argues that he was unable to discern whether a potential sentencer should have been excused for cause. Soria's argument rests on a faulty premise. "`[T]he fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating, does not mean that the rule of *Lockett* is violated.'" *Vuong v. Scott,* 62 F.3d 673, 680 (5th Cir. 1995) (quoting *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658 (1993)) (other citation omitted).[13] Contrary to Soria's argument, he was not entitled to challenge prospective jurors for cause who might view his evidence proffered in mitigation as the oft-cited, double-edged sword.

---

[13] The rule of *Lockett* requires, in a capital case, that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or background and any circumstances of the offense that the defendant submits as a basis for a sentence less than death. *Vuong,* 62 F.3d at 677.

Accordingly, although the trial judge did not allow the particular phrasing Soria sought, we are confident that the form of questioning permitted by the trial court was sufficient to allow an intelligent exercise of his peremptory challenges. *See Herman,* 98 F.3d at 174 (explaining that no constitutional violation was shown where the trial judge afforded considerable latitude to investigate possible bias in prospective jurors). In other words, the voir dire questioning was sufficient to allow Soria to determine whether a prospective juror would consider the evidence proffered in mitigation by the defense. Soria is entitled to no more. He therefore has failed to make a substantial showing of the denial of a federal right.

F.    CHALLENGE FOR CAUSE OF VENIRE MEMBER POLLARD

Soria contends that the trial court's refusal to excuse venire member Pollard for cause violated his Sixth Amendment right to an impartial jury. Soria argues that the voir dire examination of Pollard revealed that his views precluded him from considering a defendant's youth in mitigation of the death penalty.[14]

On direct appeal, the Texas Court of Criminal Appeals opined that a juror may give any or no weight to evidence in its determination of the special issues. *Soria,* 933 S.W.2d at 65. "All that the [C]onstitution requires is that he not be precluded from considering evidence offered in mitigation and that he be

---

[14]   When asked whether he thought "the youthfulness, the age or the maturity or lack thereof, of the defendant would have any bearing on how you might answer those questions," Pollard answered that it would not.

provided a vehicle to give effect to such evidence."  *Id.*

To the extent that the Court of Criminal Appeals states that it is the sentencer's prerogative to determine the weight given mitigating evidence, we certainly agree.  *See Eddings v. Oklahoma,* 455 U.S. 116, 102 S.Ct. 869, 877 (1982).  However, a sentencer "may not give [mitigating evidence] no weight by excluding such evidence from [his] consideration."  *Id.*  The Supreme Court has made clear that a sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence."  *Id.*  Therefore, because the voir dire examination of venire member Pollard indicates that he could not consider a defendant's youth in mitigation of the death penalty, it appears that Pollard's views were such that he should have been excused for cause.[15]

As previously set forth in section C of this opinion, Soria exercised a peremptory challenge against Pollard, which is fatal to his claim that his right to an impartial jury was violated.  *See Ross,* 487 U.S. at 88, 108 S.Ct. at 2278.  Soria has not made a substantial showing of the denial of a federal right with respect to this claim.

G.    WRONGFUL EXCUSAL OF VENIRE MEMBER PALACIOS

Soria contends that the trial court's excusal for cause of venire member Palacios violated his right to an impartial jury.  As set forth previously, the standard for determining when a venire member may be excluded for cause is whether the prospective

---

[15]  It is well established that a defendant must be allowed to offer evidence of his youth in mitigation the death penalty. *Eddings,* 455 U.S. at 115, 102 S.Ct. at 877.

22

"juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. at 852 (internal quotation marks and footnote omitted). A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness. *Jones v. Butler*, 864 F.2d at 362.

During the voir dire examination of venire member Palacios, the trial court granted the State's motion to excuse her for cause based on her views regarding the death penalty. Soria now asserts that Palacios related to the trial judge that, if the evidence required, she could answer the punishment issues affirmatively. She repeatedly answered the prosecutor's questions in a way that would *not* require that she be excused for cause under the *Witt* standard, Soria argues. Finally, Soria claims there was no reason for the prosecutor to continue questioning Palacios regarding these views other than an attempt to elicit "vacillation."

Soria correctly states that Palacios initially responded affirmatively, albeit equivocally, to the trial court's inquiry regarding whether she could answer "yes" to the punishment issues knowing that the death penalty would be assessed.[16] After

---

[16]

> THE COURT: Let me ask it one more way, then we will move on. If after -- if you found somebody guilty of capital murder, and then you went back to answer these questions, if in your mind the facts that you decided you heard were such that in your mind that you felt like each of those questions should be answered yes -- and, of course, you know from

Palacios's response, the trial court stated "All right. Let's move on." The prosecutor did make another inquiry with respect to that line of questioning--approximately one-half page of transcript--but then heeded the court's instruction to "move on" and began to question Palacios regarding, among other things, her views on jury sequestration and the concept of proof beyond a reasonable doubt. Subsequently--twelve pages later in the transcript--the prosecutor asked Palacios if she had any questions regarding "anything that we have talked about," and Palacios indicated that "the question is still in my mind" in regard to imposing the death penalty.

The record therefore repudiates Soria's assertion that the prosecutor's repetitive questioning evoked Palacios's "vacillation." It was Palacios herself who returned to the subject of her views on the death penalty.

In granting the State's motion to excuse Palacios for cause, the trial court found as follows:

> Mrs. Palacios, under the circumstances and listening to your answers in their entirety, and I know it has been a long time. We have been at this right at an hour and a half, with a little short break.
>
> *I feel like viewing your answers in its*

---

what you have been told that if you answer all three of them yes, that is going to cause me to assess the death penalty, okay?

If the facts in your mind were such that you felt like the answers to each of those questions should be yes, I guess the bottom line question is: Could you answer them yes?

MRS. PALACIOS: I guess I am going to say yes.

24

*totality that you wouldn't be able to fairly consider the law in regard to the death penalty as the procedure was explained to you.*

*       *       *

I appreciate very much you being down here and participating to this extent and I know it was difficult for you.

MRS. PALACIOS: It was.

THE COURT:      And I certainly understand that.  And I watched you and listened to you. And I know how hard it was for you.

But listening to your answers and watching you and observing how you were affected by struggling with all of these things, I am going to go ahead and excuse you at this time.

(emphasis added).

On Soria's direct appeal, the Court of Criminal Appeals found

as follows:

Palacios' answers reflect that she was overwhelmed by the gravity of the task and was virtually unable to give a direct answer. Although at one point in responding to questions from the trial court she stated that she could answer the special issues, "yes" according to the evidence, that response was an anomaly.  She continually expressed difficulty with the punishment phase of trial and evaded a direct response as to whether she could follow the law.  Palacios repeatedly stated that the task as a juror on punishment would "be hard" for her, but would not state whether or not she could or could not follow the law.

*       *       *

Review of Palacios' entire voir dire testimony reflects that she was tormented by the gravity of the task to the extent that she was unable to directly answer the State's questions as to whether she could follow the law and answer the issues according to the

25

> evidence. In view of the equivocal and indirect nature of Palacios' responses, and her apparent struggle over whether she could remain impartial, we defer to the trial court.

*Soria v. State,* 933 S.W.2d at 61-62.

We agree. The record indicates that Palacios was virtually unable to respond directly to the prosecutor's inquiry regarding whether she could affirmatively answer the special issues if proven beyond a reasonable doubt, with the knowledge that such answers would cause the trial court to assess the death penalty. Although she initially stated to the trial judge she could do so, she later gave the following responses: "I am as confused as you are. I probably am not qualified"; "Probably I would vote maybe no to one so that at the same time maybe, you know, not the death penalty"; "I guess in all sincerity, it probably -- in this case, I probably could not go for the death penalty" because of my four children; "I will just go with not. No."

The trial court's finding that Palacios's views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath has not been rebutted by Soria with clear and convincing evidence. As such, Soria has failed to make a substantial showing of the denial of a constitutional right.

H. TRIAL COURT'S FAILURE TO DEFINE "DELIBERATELY"

Soria argues that the trial court's failure to decide (when defense counsel first inquired during voir dire) whether the jury

26

would be instructed regarding the definition of "deliberately"[17] violated his due process rights and the right to intelligently exercise his peremptory challenges in violation of the Sixth and Fourteenth Amendments.

In a pretrial motion, Soria requested permission to question venire members regarding the definition of the word "deliberately." In that motion, Soria advanced three definitions of the word "deliberately." Prior to the commencement of voir dire, the trial court expressly granted Soria's request with respect to the following definition:[18]

> The term "deliberately" is not the linguistic equivalent of "intentionally" as used in the Court's Charge on guilt-innocence;[19] rather, it is the thought process which embraces more than a will to engage in conduct and activates the intentional conduct.

(footnote added).

After venire member number five was excused during voir dire, defense counsel orally inquired whether the trial court would be

---

[17] As set forth previously, the punishment charge required the jury to answer two questions, the first one being: "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result . . . ."

[18] The trial court expressly denied Soria's request to question the prospective jurors regarding the other two definitions in the motion.

[19] The court's charge at the guilt-innocence stage of the trial instructed the jury to determine whether, among other things, Soria "intentionally cause[d] the death of an individual . . . ." Intentionally was defined in the jury charge as follows: "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

27

submitting the above-quoted definition at the punishment phase. The court stated that it had not yet decided. However, the court did state that "in future voir dire, counsel are instructed that if they want to, to advise the jurors that we anticipate or we think that the Court may define deliberately in such terms." "Such terms" apparently referenced the above-quoted definition.

Subsequently, in the context of objecting to the court's questioning of venire member number seventy-three, defense counsel referred to previously "filed pretrial motions and . . . numerous requests" to include a definition of "deliberately" in the punishment charge. The trial judge responded that, although he had granted a defense motion to question the venire regarding a specific definition of "deliberately," he was unaware that a motion had been filed requesting that "deliberately" be defined in the charge.[20] Defense counsel then stated that he believed he had requested that "deliberately" be defined in the charge but could not remember whether such a motion had been filed. After some discussion, the trial court granted the defense's request to include the previously-quoted definition of "deliberately" in the

---

[20] The trial court stated:

> Well, this is the first time that the Court has been aware -- and I have been aware that [you] have asked me whether or not I was going to charge on deliberately. And I have said on several occasions that I didn't know.
>
> This is the first time an official, to my knowledge, request of the Court to charge on deliberately as laid out in Motion No. 29 has been made.

28

punishment phase charge.

Soria now claims that he "was unable to adequately question some sixty-seven venire members concerning an instruction in the punishment charge." As previously stated, after venire member number five was questioned, Soria asked the trial court whether "deliberately" would be defined in the charge. We understand Soria's argument to be that the trial court's failure to make the final decision at that point rendered counsel unable to adequately question venire members numbered six through seventy-two.

Soria asserts that *Knox v. Collins,* 928 F.2d 657 (5th Cir. 1991), controls the disposition of this claim. We disagree. In *Knox,* the state trial court allowed defense counsel to question the venire members regarding their understanding of what constitutes a "life sentence" in Texas. *Id.* at 658. During voir dire, the trial court made certain statements indicating that he would instruct the jury on the law regarding parole eligibility. Relying on those statements, defense counsel adopted a different strategy for jury selection and, thus, refrained from using peremptory challenges against two venire members whose views regarding a "life sentence" appeared unfavorable to the defendant.

Although we acknowledged our prior case law holding that the Constitution did not mandate instruction on parole in capital cases,[21] we concluded that the trial judge's unkept promise to

---

[21] We decided *Knox* prior to the Supreme Court's opinion in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187. As explained previously in section D of the instant opinion, because Soria would have been eligible for parole under Texas law if sentenced to life imprisonment, the Constitution did not require

29

instruct the jury--such an instruction would have corrected any misconceptions about parole--deprived Knox of a fair opportunity to intelligently exercise the peremptory challenges he was provided under Texas law. *Id.* at 662. Thus, we granted habeas relief based on the denial of due process.

*Knox* clearly offers Soria no succor. In the instant case, prior to the commencement of voir dire, the trial court granted Soria permission to question venire members on a definition of "deliberately" suggested by Soria.[22] Additionally, the trial judge instructed counsel that they could advise prospective jurors that counsel anticipated the court would use that particular definition of deliberately. By all indications, the trial judge intended to use the definition advanced by Soria. These intentions later materialized when the trial court ultimately included in the punishment phase charge the same definition of deliberately Soria advanced in a pretrial motion granted by the court. Unlike *Knox,* the trial judge in the instant case kept his promise.

Moreover, this Court previously rejected a Texas habeas petitioner's claim that his due process rights and Sixth Amendment right to trial by jury and counsel were violated when the state trial court refused to allow him to inquire into the venire members' understanding of the term "deliberately." *Milton v.*

---

that his jury be instructed with respect to parole.

[22] As a practical matter, we do not understand why counsel, once the trial court granted the motion to allow questioning based on a particular definition, would not make inquiries of the venire members based on that particular definition.

*Procunier,* 744 F.2d 1091, 1095 (5th Cir. 1984). We explained that "counsel has no right to ask prospective jurors to articulate their understanding of the language." *Id.; see also Herman,* 98 F.3d at 174 (rejecting petitioner's claim that trial court's refusal to inform him of the instruction to be given at the punishment phase on evaluating mitigating evidence deprived him of his right to intelligently exercise his peremptory challenges). If a trial court's refusal to allow questioning during voir dire regarding the definition of "deliberately" does not rise to the level of a constitutional violation, then certainly the trial court's "failure" in the instant case to make a *final* decision initially regarding the definition of deliberately is not constitutional error. Accordingly, for all the preceding reasons, we conclude that Soria has failed to make a substantial showing of the denial of a federal right.

I. SYSTEMATIC UNDERREPRESENTATION OF HISPANICS AND YOUTH

Soria next argues that the method of selecting the jury panel (voter registration lists) in Tarrant County at the time of his trial systematically underrepresented Hispanics and young persons in violation of the Sixth Amendment. In the court below, in response to this argument, the respondent asserted that the claim was procedurally barred. The district court did not address the procedural bar; instead, it rejected the claim on the merits. The district court erred in so doing.

During Soria's state habeas proceedings, the trial court,

31

citing *Ex parte Gardner,* 959 S.W.2d 189 (Tex.Crim.App. 1998),[23] found that Soria had "forfeited his fair cross section complaint when he failed to raise it on direct appeal." The Texas Court of Criminal Appeals adopted the trial court's findings on this claim. Although the state court addressed the merits of the claim in the alternative, it expressly applied a procedural bar to review of the claim.[24] We therefore are precluded from reviewing the merits of the claim unless Soria establishes cause for the default and actual prejudice resulting from the constitutional violation. *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565. Because Soria attempts to demonstrate neither cause nor prejudice, this claim is procedurally barred.

In an abundance of caution, we briefly address the merits of this argument in the alternative. This Court has held that "[t]he fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore underrepresented on jury panels presents no constitutional issue." *United States v. Brummitt,* 665 F.2d 521, 527 (5th Cir. 1981) (citing *United States v. Arlt*, 567 F.2d 1295, 1297 (5th Cir. 1978)). Our case law clearly precludes Soria from making a

---

[23] In that case, the Court of Criminal Appeals held that the habeas applicant forfeited his right to challenge the sufficiency of the warnings he received at his pretrial psychiatric examination because he had not raised it on direct appeal. *Ex parte Gardner,* 959 S.W.2d at 191.

[24] "A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim." *Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir. 1999).

substantial showing regarding the denial of a federal right with respect to this issue.

J.    INEFFECTIVE ASSISTANCE OF COUNSEL

Soria contends that trial counsel rendered ineffective assistance by failing to adequately develop and present important evidence in mitigation of the death penalty.  To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984).  To establish prejudice, the petitioner must show that "it is reasonably likely that the jury would have reached a different decision absent counsel's unprofessional errors."  *Faulder v. Johnson,* 81 F.3d 515, 519 (5th Cir. 1996).

Soria relies on several cases from various courts,[25] including the Fifth Circuit, in which attorneys were found to have rendered ineffective assistance by failing to present mitigating evidence during the punishment phase.  Unlike Soria's counsel, however, the attorneys in those cases presented either very little or no evidence in mitigation of the death penalty.

Soria concedes that his counsel presented mitigating evidence at the punishment phase.  In fact, the record reflects that Dr. James Grigson, a psychiatrist, testified that he examined Soria

---

[25]    *Jones v. Thigpen,* 788 F.2d 1101 (5th Cir. 1986); *Jackson v. Herring,* 42 F.3d 1350 (11th Cir. 1995); *Brewer v. Aiken,* 935 F.2d 850 (7th Cir. 1991); *Mathis v. Grant,* 704 F.Supp. 1062 (N.D.Ga. 1989); *Averhart v. State,* 614 N.E.2d 924 (Ind. 1993).

33

and, in his opinion, Soria would not be a continuing threat to society. Dr. Grigson also testified that Soria was remorseful about the killing, that Soria experienced nightmares after the killing, and that Soria could not have killed the victim on his own--Soria's confession indicated that he committed the crime at the direction of Mike Lagunas.

Soria's mother and brother testified regarding the locations where the family had lived, the family's migrant farm work, Soria's erratic job history, the family's membership in the Jehovah's Witness Church, Soria's dropping out of school after ninth grade, and the bad influence of Soria's new friends, especially codefendant Lagunas.

Notwithstanding that evidence, Soria argues that because of counsel's failure to "thoroughly investigate," a significant amount of mitigating evidence regarding the hardships of his life was not presented to the jury, including: his father's abuse of alcohol and its relation to the mistreatment he suffered at the hands of his father; his poor performance in school; the isolation he experienced due to the limitations placed on his activities by his father and his religion; the depression he experienced because of the sudden death of his best friend ten months prior to the instant offense; his expulsion from the family home just prior to the murder.

Contrary to Soria's assertion, there was some evidence presented by the defense at the punishment phase regarding Soria's poor performance in school (Soria's grades declined; he dropped out

34

of high school) and his expulsion from the family home (Soria "was kicked out of his home the Friday that the offense actually occurred").

In any event, it is clear from a review of the record that defense counsel was attempting to portray Soria as a young man who had not been in any serious trouble until he fell under the influence of codefendant Lagunas. During closing argument at the punishment phase, counsel pointed to the portion of Soria's confession to the police in which Soria stated that the first time they attempted to rob the victim, he became scared and left because he could not do it. Counsel further argued to the jury that "it wasn't until . . . they reported [back] to Mike [Lagunas] . . . and he said, `Let's do it.' It was Mike who was the leader. It was Mike under whom this young man was led."

Moreover, based on defense counsel's affidavit, the state court found that despite the fact that defense counsel encouraged Soria to be candid and forthcoming about his past and family background, the allegations of physical abuse and the father's alcoholism were never revealed to counsel or to the psychiatrist who examined Soria. The state court expressly found Soria's claim that he was beaten by his father not credible. The state court found that Soria's defense at trial was that he came from a good home, and the instant crime was an aberration. The state court further found that the evidence Soria now contends should have been presented in mitigation to the jury amounts to a "defense that [Soria's] father turned [him] into a monster." Soria has not

35

rebutted these state court findings with clear and convincing evidence.

Soria has failed to show that counsel's investigation was constitutionally inadequate. Counsel talked to the family members and encouraged Soria and his family to be candid regarding his past behavior and family background. Even had the state court not found the physical abuse allegations incredible, counsel should not be faulted for Soria's decision to conceal any such evidence. *Cf. Moore v. Johnson,* 194 F.3d 586, 607 (5th Cir. 1999) (explaining that petitioner's ability to meet his burden of demonstrating inadequate investigation by counsel was substantially undermined when petitioner chose to present an alibi defense). Accordingly, we conclude that counsel's investigation and the strategic decisions based thereupon were reasonable.

Moreover, even assuming *arguendo* that Soria could show that counsel's performance was deficient, he cannot show prejudice. As set forth above, the state court discredited the abuse allegations, and the jury was presented evidence of both Soria's poor school performance and his expulsion from the family home. Soria has not persuaded us that, but for counsel's failure to present evidence of the sudden death of his best friend and his resulting depression and isolation, there is a reasonable probability that the result of the proceeding would have been different. *See, e.g., Faulder v. Johnson*, 81 F.3d 515, 519-20 (5th Cir. 1996) (holding no prejudice shown when counsel failed to introduce evidence of, among other things, brain damage from injury and organic brain disorder which

36

impaired his judgment and impulse control).  Soria has not made a substantial showing of the denial of a federal right with respect to this claim.

K.    CONCLUSION

In sum, Soria has not shown that any of his claims are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further.  *Drinkard v. Johnson,* 97 F.3d 751, 755-56 (5th Cir. 1996).  Because Soria has failed to make a substantial showing of the denial of a constitutional right, we DENY his request for a COA.

DENIED.