### Kevin Michael WATTS, a/k/a Kevin Vann, Petitioner,

v.

### Nathaniel A. QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

#### No. Civ. SA05CA1029OG.

United States District Court, W.D. Texas, San Antonio Division.

Aug. 21, 2006.

John Michael Economidy, Attorney at Law, Jefferson Moore, San Antonio, TX, for Petitioner.

Georgette P. Oden, Attorney General's Office, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER

ORLANDO L. GARCIA, District Judge.

Petitioner Kevin Michael Watts, also known as Kevin Vann, filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his February, 2003, Bexar County capital murder conviction and sentence of death. For the reasons set forth below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

### I. Statement of the Case

A. *Petitioner's Offense*

The essential facts surrounding petitioner's capital offense have never been in dispute. Petitioner executed a pair of detailed, written statements shortly after his arrest and has never presented any state or federal court with any evidence controverting same.[1]

Furthermore, the surviving victim and eyewitness to petitioner's armed robbery

---

1. Two versions of petitioner's original, written, post-arrest, statement or confession were admitted into evidence and read verbatim into the record during the guilt-innocence phase of petitioner's capital murder trial. A redacted or edited version was admitted as State Exhibit No. 2 and recounted petitioner's robbery of the Sam Won Gardens restaurant, his fatal shooting of three persons inside the restaurant, his kidnaping of a fourth person from the restaurant, and the circumstances surrounding petitioner's arrest several hours later. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 18 of 26, testimony of Barney Whitson, at pp. 63–68. A copy of State Exhibit No. 2 appears in S.F. Trial, Volume 24 of 26.

The full, unedited, version of petitioner's original statement was admitted into evidence as State Exhibit No. 2–A and read into the record during the punishment phase of petitioner's trial. S.F. Trial, Volume 22 of 26, testimony of Barney Whitson, at pp. 18–19. A copy of State Exhibit No. 2–A appears in S.F. Trial, Volume 25 of 26.

In addition, petitioner gave law enforcement officers a second written statement shortly after he executed his first statement. This second statement was admitted and read verbatim into evidence during the punishment phase of petitioner's capital trial as State Exhibit No. 101. S.F. Trial, Volume 22 of 26, testimony of Barney Whitson, at pp. 22–27. A copy of State Exhibit No. 101 appears in S.F. Trial, Volume 26 of 26.

and fatal shooting of three people testified at petitioner's trial in a manner wholly consistent with petitioner's written confessions. More specifically, Hye Kyong Kim, the widow of Sam Won Gardens restaurant manager Hak Po Kim, testified without contradiction at the guilt-innocence phase of petitioner's capital trial that, on the morning of March 1, 2002, (1) petitioner entered the restaurant, fired a shot, and directed her and her husband at gunpoint to move to the kitchen area, (2) petitioner then directed the Kims and two restaurant employees, Yuan Tzu "Tina" Banks and Chae Sun "Gina" Shook, to face a wall and kneel, (3) Mrs. Kim then heard three shots, turned, and saw three bodies on the floor, (4) petitioner then forced her to follow him, open the cash register, and give petitioner all the money in the register, (5) petitioner directed Mrs. Kim to retrieve the keys to her husband's vehicle from his pocket, (6) when petitioner demanded more money, Mrs. Kim also retrieved her husband's wallet as well as his keys and gave same to petitioner, and (7) petitioner forced her into her husband's vehicle and fled the scene in their vehicle.[2]

A produce delivery truck driver testified at petitioner's trial that, on the morning in question (1) he observed a black male shove a female into the Kims' vehicle and flee the scene and (2) he entered the unusually silent restaurant and observed two bodies on the floor.[3]

Several San Antonio Police Officers testified regarding the circumstances surrounding petitioner's arrest on the afternoon of March 1, 2002, specifically about (1) the petitioner's unsuccessful attempt to flee from police by smashing the Kims' stolen vehicle into two police vehicles before petitioner drove into a wall, rendering the Kims' vehicle inoperable, (2) Mrs. Kim's distraught condition as she fled the damaged stolen vehicle, and (3) the handgun and cash police found inside petitioner's jacket once petitioner had been arrested.[4]

Autopsies revealed that each of the three persons shot inside the restaurant died as a result of a single gunshot wound to the back of the head.[5]

2. S.F. Trial, Volume 20 of 26, testimony of Hye Kyong Kim, at pp. 132–41, 186–89, 191–95, 197, 220–22. Mrs. Kim also testified petitioner threatened her during their flight from the restaurant, struck her in the face with his fist, and fired the gun inside the vehicle. *Id.*, at pp. 195, 202–03, 208–09.

3. S.F. Trial, Volume 18 of 26, testimony of Jesse Rios, at pp. 77–114.

4. Several San Antonio Police officers testified (1) petitioner drove the Kims' stolen vehicle at a rapid rate of speed toward the exit of an apartment complex in North San Antonio, (2) the petitioner appeared wide-eyed when he saw police officers in full uniform, (3) petitioner drove the Kims' stolen vehicle, a silver Toyota 4Runner, into the side of a uniformed officer's unmarked vehicle, hopped a curb, struck a second, marked, police cruiser, and then slammed into the wall of an apartment building, at which point the Kims' vehicle was no longer operable, (4) a search of petitioner produced a TEC–22 handgun tied to the petitioner's neck and shoulder inside the petitioner's jacket, as well as several rolls of cash, and (5) Mrs. Kim appeared to be distraught as she fled the damaged vehicle. S.F. trial, Volume 19 of 26, testimony of Andy Hernandez, at pp. 41–60; testimony of David Payne, at pp. 85–98; testimony of Robert Rosales, at pp. 138–51; Volume 20 of 26, testimony of James Holguin, at pp. 27–41.

A latent fingerprint examiner also testified fingerprints found inside the Kims' stolen 4Runner matched petitioner's. S.F. trial, Volume 20 of 26, testimony of Ray Frausto, at pp. 116–22.

5. The medical examiner who conducted the autopsies of the three victims testified without contradiction during the guilt-innocence phase of petitioner's trial that (1) each of the three victims died as a result of a single gunshot wound to the back of the head, (2) in each case, the fatal bullet wound tracked

Ballistics tests established the handgun petitioner was carrying at the time of his arrest fired each of the fatal shots.[6]

## B. *Indictment*

On May 21, 2002, a Bexar County grand jury returned a one-Count indictment in cause no. 2002–CR–3470 charging petitioner with having fatally shot Hak Po Kim (1) while in the course of the same criminal transaction in which petitioner fatally shot Yuan Tzu Banks and (2) while in the course of committing and attempting to commit the robbery of Hak Po Kim, Yuan Tzu Banks, Chae Sun Shook, and Hye Hyong Kim.[7]

## C. *Guilt–Innocence Phase of Trial*

The guilt-innocence phase of petitioner's trial began on February 10, 2003. On February 13, 2003, after hearing the evidence summarized above and deliberating less than three hours, the jury returned its verdict, finding petitioner guilty of capital murder.[8]

## D. *Punishment Phase of Trial*

The punishment phase of petitioner's trial commenced on February 14, 2003.

### 1. *The Prosecution's Case*

During the punishment phase of petitioner's trial, the prosecution presented (1) a host of documentary evidence and testimony from law enforcement officers regarding numerous instances of criminal conduct by petitioner[9] and (2) testimony from correctional officers concerning nu-

---

from back to front and downward through the skull and brain, with the bullet coming to rest inside the base of the skull, and (3) all three fatal gunshot wounds were consistent with a shot having been fired from above and behind the victim's head. S.F. Trial, Volume 19 of 26, testimony of Randall Frost, at pp. 13–26.

6. A firearms examiner testified (1) that four cartridge casings found inside the restaurant were all fired by the same handgun police found tied around petitioner's neck and shoulder at the time of his arrest and (2) the three bullets removed during the autopsies of the three victims were all fired by the same weapon, i.e., the one petitioner had tied to his neck and shoulder at the time of his arrest. S.F. Trial, Volume 20 of 26, testimony of Edard William Love, Jr., at pp. 84–94.

7. Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), Volume 1 of 2, at p. 141.

8. Petitioner's jury began its deliberations at the guilt-innocence phase of trial not earlier than 1:40 p.m. on February 13, 2003 and returned its guilty verdict not later than 4:10 p.m. the same date. S.F. Trial, Volume 21 of 26, at p. 128; Trial Transcript, at pp. 75–89.

9. More specifically, a fingerprint examiner testified petitioner's fingerprints matched those found on not less than eleven judgments of conviction in various misdemeanor crimi-

nal proceedings, including the offenses of evading arrest, criminal mischief, possession of marijuana, failure to identify (two counts), criminal trespass (three counts), driving while intoxicated, resisting arrest, and assault causing bodily injury (two counts). S.F. Trial, Volume 22 of 26, testimony of Richard Contreras, at pp. 10–16.

A juvenile probation officer testified petitioner had received a probated sentence in 1997 for unlawfully carrying a weapon. S.F. trial, Volume 23 of 26, testimony of Eddie Ortiz, at pp. 7–9.

A San Antonio Police officer testified about an incident on July 21, 2001 in which (1) he responded to a call from a woman named Marquketa Rector, whose face was lacerated and covered in blood and who identified petitioner as the person who had beaten her in the face, (2) he arrested petitioner, (3) thereafter, while emergency medical personnel treated Ms. rector's injuries, Tiffany Prince, who identified herself as petitioner's common law wife, approached him and informed him that petitioner had also assaulted her by striking her repeatedly in the face. S.F. Trial, Volume 23 of 26, testimony of Montrose Butler, at pp. 124–29.

Another San Antonio Police officer testified about an incident on February 8, 2002 during which petitioner identified himself as a member of a street gang. S.F. Trial, Volume 23 of 26, testimony of Ricardo Vijil, at pp. 133–34.

merous instances of violent or disruptive conduct by petitioner while in detention awaiting trial for capital murder.[10]

The prosecution also introduced a letter petitioner had written while in custody awaiting trial for capital murder, in which petitioner made several ethnic slurs against Hispanics and Anglos and indicated his desire to join a Black prison gang.[11]

Petitioner's kidnap victim, Hye Kyong Kim, returned to the stand at the punishment phase of petitioner's capital trial and testified that, after petitioner fled the restaurant with her in her husband's vehicle, petitioner (1) tied her hands to a headrest, (2) drove around for several hours, (3) forced her to remove her shoes and pants, (4) repeatedly sprinkled cocaine on his penis and forced her to perform fellatio on him, (5) threatened to insert the barrel of his gun inside her vagina, (6) snorted cocaine with a rolled-up ten or twenty dollar bill, (7) unsuccessfully attempted to have sex with her on several occasions, (8) sprinkled cocaine on her vagina and licked it off, (9) gave her a beer to drink, (10) blindfolded her and took her to an apartment complex where he locked her in a closet, directed her to remove her underwear, and later directed her to put on a dirty pair of underwear, (11) removed her from the closet and again directed her to fellate him multiple times, (12) after again unsuccessfully attempting to sexually assault her, took a shower, and gave another occupant of the apartment permission to rape her, (13) made her count the money he had taken from the restaurant, and (14) again blindfolded her before returning her to the stolen vehicle just before police apprehended him.[12]

### 2. The Defense's Case

The defense introduced testimony from petitioner's cousins and mother-in-law to the effect that (1) petitioner had developed a drug problem while living with his mother in California and, at age fourteen, moved to live with an aunt in San Antonio, (2) petitioner was a loving, friendly, giving, kind-hearted person, (3) the handgun which petitioner told police officer was his

---

Yet another San Antonio Police officer testified about an incident on December 15, 1998 during which petitioner violently resisted arrest, fought with the officer, and caused the officer to sustain a severely lacerated leg which required several sutures to close. S.F. Trial, Volume 23 of 26, testimony of Randy Geary, at pp. 101–23.

10. More specifically, several correctional officer at the Bexar County Adult Detention Center testified concerning incidents (1) on March 6, 2002, during which petitioner exchanged punches with an Hispanic inmate, (2) on July 1, 2002, during which petitioner became argumentative, assumed a physically threatening, combative, posture, verbally abused, and threatened a guard, (3) on October 13, 2002, during which petitioner had a physical altercation with an Hispanic inmate in the rec yard which necessitated both inmates being sent to the infirmary, and (4) on November 14, 2002, during which petitioner and another Black inmate were involved in a fight with two Hispanic inmates. S.F. Trial,

Volume 23 of 26, testimony of Carlos Soto, at pp. 30–34; testimony of Jack Farmer, at pp. 64–69; testimony of William Wadsworth, at pp. 55–58; testimony of Christopher LeBlanc, at pp. 46–49.

11. The letter in question was admitted into evidence during the punishment phase of petitioner's trial as State Exhibit No. 105–A. S.F. Trial, Volume 23 of 26, testimony of Mark Wells, at pp. 79–81 & 95. A copy of State Exhibit No. 105–A appears in S.F. Trial, Volume 26 of 26.

Significantly, the only objection petitioner's raised to the admission of this letter consisted of an argument that BCADC officials had illegally seized the letter. At no point did petitioner's trial counsel raise any complaint that admission of the letter violated petitioner's First Amendment rights. S.F. Trial, Volume 23 of 26, at pp. 82–95.

12. S.F. Trial, Volume 22 of 26, testimony of Hye Kyong Kim, at pp. 51–60.

really belonged to one of his cousins, (4) another of petitioner's cousins was actually the person who had assaulted Marquketa Rector, not petitioner, (4) his conduct on March 1, 2002 was aberrational, (5) the night before the murders, petitioner consumed massive quantities of alcohol and cocaine, and multiple pills of Ecstasy, Valium, and Xanax, and (6) petitioner was a good father to his daughter.[13]

Petitioner's common law wife testified on direct examination that (1) she had known petitioner for two years and seven months, (2) she had only known petitioner to use drugs during the two months immediately prior to petitioner's capital offense, (3) when petitioner was high on drugs he was a very different person than he was otherwise, (4) she spoke with petitioner on the phone the night before the murders and could tell petitioner was high on something, and (5) while petitioner once pushed her in the face, petitioner was normally a nice, loving, person.[14] On cross-examination, however, she admitted (1) petitioner had a drug problem at least as early as July, 2001, (2) petitioner failed to take advantage of the drug-treatment programs available to him while he was in custody prior to March, 2002, and (3) petitioner had been in a street gang in California before he came to live in Texas.[15]

The defense then introduced the testimony of a licensed social worker and chemical dependency counselor who described herself as a "mitigation specialist" and who testified she had interviewed petitioner and his family and reviewed petitioner's school, jail, medical, and psychiatric records and opined that (1) petitioner had experienced many negative influences during his developmental years and (2) petitioner was probably in the midst of a substance-induced psychosis or delusional state at the time of his capital offense.[16] Significantly, the state trial court repeatedly sustained the prosecution's hearsay objections whenever defense counsel attempted to elicit testimony from this witness concerning the contents of petitioner's school, medical, or jail records and concerning the contents of her discussions with petitioner's family and friends.[17]

### 3. The Verdict

After deliberating less than three hours, the jury returned its verdict at the punishment phase of petitioner's capital trial, unanimously finding (1) there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all the evidence, including the circumstances of the offense and the defendant's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant that a sentence of life imprisonment, rather than a death sentence, be imposed on petitioner.[18]

### E. Direct Appeal

In an unpublished, *per curiam* opinion issued December 15, 2004, the Texas Court

---

13. S.F. Trial, Volume 23 of 26, testimony of Sonia Watts, at pp. 170–225; testimony of Ronald Melvin Watts, at pp. 226–47; testimony of Alicia Prince, at pp. 247–54.

14. S.F. Trial, Volume 24 of 26, testimony of Tiffany Prince, at pp. 73–86.

15. *Id.*, at pp. 91–103.

16. S.F. Trial, Volume 24 of 26, testimony of Linda Mockeridge, at pp. 113–32.

17. *Id.*, at pp. 122–23, 128–29, 132.

18. Petitioner's jury retired to deliberate at the punishment phase of petitioner's trial at 3:35 p.m. on February 19, 2003 and returned its verdict at approximately 5:50 p.m. that same date. Trial Transcript, Volume 1 of 2, at pp. 102–03; S.F. Trial, Volume 24 of 26, at pp. 198–206.

of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal.[19] Petitioner did not thereafter seek certiorari review of his conviction and sentence by the United States Supreme Court.

## F. State Habeas Corpus Proceeding

Petitioner filed his first state habeas corpus application on May 3, 2004, asserting three claims for relief therein.[20] On October 14, 2004, the state responded to petitioner's first state habeas corpus application.[21] On October 25, 2004 petitioner filed a "supplemental" state habeas corpus application in which, for the first time, he asserted claims that his trial and appellate counsel had rendered ineffective assistance by failing to timely object to, and present

points of error on direct appeal complaining about, the state trial court's rulings on the admissibility of Ms. Mockeridge's expert testimony.[22]

In an Order issued November 23, 2004, the state habeas trial court (1) found the trial court had ruled that Ms. Mockeridge, while not specifically determined to be an expert on mitigation, would be permitted to testify as an expert, (2) found the trial court sustained the prosecution's hearsay objection to Ms. Mockeridge's summary chart, (3) found Ms. Mockeridge was permitted to testify regarding the nature of the documents and other evidence she had reviewed while developing her psycho-social history of petitioner but was not allowed to testify as to the specific

19. *Watts v. State,* AP–74,593 (Tex.Crim.App. December 15, 2004).

As points of error on direct appeal, petitioner argued (1) the state trial court abused its discretion when it (a) admitted evidence during the punishment phase of petitioner's trial indicating petitioner's desire to join a black racist prison gang and (b) permitted the prosecution to make a racist jury argument referring to same, (2) petitioner's sentence was grossly disproportionate to petitioner's crimes, and (3) the death sentence violates the Eighth Amendment. The Texas Court of Criminal Appeals held (1) petitioner failed to properly preserve his complaints about the admission of petitioner's letter indicating petitioner's desire for membership in a black prison gang and the prosecution's closing argument referring to same by failing to timely object to same on constitutional grounds, i.e., the grounds urged on appeal, (2) there is no right to a proportionality review of a capital sentence, and (3) petitioner's conclusory Eighth Amendment claim was without merit.

20. Transcript of pleadings, motions, and other documents filed in petitioner's first state habeas corpus action, i.e., App. No. 62–250–01 & 62,650–02 (henceforth "State Habeas Transcript"), at pp. 1–34.

Petitioner's first state habeas corpus application asserted three claims for relief, to wit, arguments that (1) the state trial court erred when it "severely limited" the testimony of

petitioner's mitigation expert, (2) the state trial court erred when it permitted the prosecution to introduce evidence showing petitioner's desire to join a black racist prison gang, and (3) the prosecution improperly used its evidence of petitioner's desire to join a black prison gang in a racist manner during closing argument.

21. State Habeas Transcript, at pp. 79–99.

The state argued that (1) the state trial court had not, in fact, restricted Ms. Mockeridge's expert testimony but, rather, had permitted her to express the same opinions before the jury that she expressed during the hearing on the admissibility of her testimony and petitioner's trial counsel failed to preserve any error concerning the trial court's rulings on Ms. Mockeridge's status as an expert witness by failing to make a timely proffer of any additional testimony she could have given at petitioner's trial and failing to challenge the trial court's ruling on direct appeal, (2) petitioner's trial counsel likewise failed to preserve any alleged constitutional error in the admission of petitioner's vitriolic letter from prison or to the prosecution's closing jury argument at the punishment phase of petitioner's trial by failing to make a timely objection on constitutional grounds to same, and (3) petitioner's grounds for state habeas relief, at best, raised only harmless error.

22. State Habeas Transcript, at pp. 35–46.

contents of those hearsay documents and conversations, (4) found Ms. Mockeridge was permitted to express her opinions that numerous negative factors impacted on petitioner's childhood development and that petitioner was probably "in the midst of a substance[-]induced psychosis" at the time of his offense, (5) found any confusion in the trial court's rulings regarding Ms. Mockeridge's testimony excluded only hearsay testimony on her part and not any expression of her expert opinions, (6) found petitioner never complained to the trial court that its rulings had impacted on petitioner's constitutional right to present mitigating evidence, (7) concluded petitioner had procedurally defaulted on his constitutional complaint regarding the trial court's rulings on Ms. Mockeridge's testimony by failing to timely make a bill of exceptions regarding same and failing to present those complaints on direct appeal, (8) alternatively concluded there was no error in the trial court's rulings on the proper scope of Ms. Mockeridge's testimony, (9) found petitioner's trial counsel first raised the issue of gang membership at trial, (10) found no evidence was admitted identifying either the Longview Crips, i.e., the California street gang to which petitioner admitted once having been a member, or the Black Gorilla Family, i.e., the prison gang to which petitioner wrote he planned to seek membership, were "racist" gangs, (11) found petitioner made no constitutional objection to the admission of any evidence showing petitioner was either a member of the Longview Crips or hoped one day to be a member of the Black Gorilla Family, (12) found petitioner made no constitutional objection to the prosecution's wholly proper summary of the evidence before the jury during closing argument at the punishment phase of

petitioner's trial, and (13) concluded petitioner procedurally defaulted on his constitutional complaints about the admission of State Exhibit No. 105–A and the prosecution's closing argument by failing to make timely objections on constitutional grounds thereto.[23]

In an Order issued July 11, 2005, the state habeas trial court ruled petitioner's "supplemental" application was untimely and did not qualify under applicable state law as a "successive" application.[24]

In an unpublished, *per curiam*, Order issued October 19, 2005, the Texas Court of Criminal Appeals (1) adopted the trial court's findings and conclusions concerning petitioner's initial three claims, (2) denied all relief requested in petitioner's initial state habeas corpus application, and (3) dismissed petitioner's "supplemental" state habeas application as a successive application under the Texas writ-abuse statute.[25]

### G. *Petitioner's Federal Habeas Corpus Proceeding*

Petitioner filed his federal habeas corpus petition on December 29, 2005, alleging in his petition (1) the state trial court violated his Eighth Amendment right to present mitigating evidence when it restricted the trial testimony of its mitigation expert, Ms. Mockeridge, by not permitting her to testify "as a mitigation expert," (2) the trial court violated petitioner's First Amendment rights and the Supreme Court's holding in *Dawson v. Delaware* by permitting the prosecution to admit evidence showing petitioner's desire for membership in a black prison gang, and (3) the prosecution violated petitioner's Fifth and Fourteenth Amendment rights when it used evidence of petitioner's gang affiliation "in a racist

---

23. State Habeas Transcript, at pp. 180–204.

24. State Habeas Transcript, at pp. 169–71.

25. *Ex parte Kevin Watts*, WR–62,650–01 & WR–62,650–02 (Tex.Crim.App. October 19, 2005).

manner' during closing arguments at the punishment phase of trial".[26]

On May 18, 2006, respondent filed his answer, arguing in pertinent part that (1) petitioner had procedurally defaulted on his complaints regarding the trial court's rulings on the admissibility of Ms. Mockeridge's testimony by failing to contemporaneously object thereto, timely make a bill of exceptions, or raise same on direct appeal, (2) the state trial court committed no constitutional error in its rulings regarding Ms. Mockeridge's testimony or the admissibility of the hearsay contained in her report and summary chart, (3) petitioner procedurally defaulted on his constitutional complaints regarding the admission of petitioner's letter regarding his hoped-for prison gang membership by failing to make a contemporaneous constitutional objection thereto, (4) the trial court committed no constitutional error when it admitted petitioner's letter, (5) petitioner procedurally defaulted on his constitutional complaints concerning the prosecution's punishment-phase closing argument by failing to raise any timely objection thereto, and (6) any error in the state trial court's failure to *sua sponte* correct the prosecution during closing argument did not rise above harmless error.[27]

On June 13, 2006, petitioner filed a reply to respondent's answer in which petitioner argued (1) respondent's arguments effectively eliminated the need for petitioner to allege and prove ineffective assistance by petitioner's trial counsel, (2) the state trial court effectively prevented petitioner from presenting mitigating evidence showing the details of petitioner's neglected and deprived childhood, and (3) the "illiterate gibberish" contained in petitioner's letter from jail was erroneously construed by the

prosecution during closing argument as threatening in nature.[28]

## II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'con-

---

26. Petitioner's Petition for Writ of Habeas Corpus, filed December 29, 2005, Docket entry no. 6 (henceforth "Petition").

27. Docket entry no. 12.

28. Docket entry no. 16.

trary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

 Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *see Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v.*

*Alvarado*, 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *See Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir.2004) ("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.'"), *cert. denied*, 543 U.S. 960, 125 S.Ct. 421, 160 L.Ed.2d 325 (2004); *Pondexter v. Dretke*, 346 F.3d 142, 146 & 149 (5th Cir.2003)(holding, pursuant to § 2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir.2003)(holding the same), *cert. denied*, 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); 28 U.S.C. § 2254(e)(1).

 Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the

state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir.2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002) (*en banc*) (holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. *Exclusion of Mitigating Evidence Claim*

#### A. *The Claim*

In his first claim herein, petitioner argues the state trial court violated his Eighth Amendment right to present mitigating evidence when it restricted the trial testimony of its mitigation expert, Ms. Mockeridge, by not permitting her to testify "as a mitigation expert" about numerous events which negatively impacted petitioner's childhood development, including the fact the petitioner (1) was sexually abused by a male baby-sitter, (2) engaged in gang activities and drug use from an early age, and (3) experienced a very disruptive family life.[29]

More specifically, petitioner argues that, but for the trial court's rulings, Ms. Mockeridge could have testified that, in her opinion, (1) petitioner's health and emotional development were at risk from his early youth, (2) petitioner felt abandoned and lacked a sense of trust, (3) as a child, petitioner was preoccupied and oriented to a survival mode, (4) persons raised in survival mode lack good coping skills, (5) as a result of having been victimized by a sexual predator, petitioner developed trust and abandonment issues and a need to belong and to have safety, which, in turn led to petitioner becoming involved with gangs by age eight, (6) petitioner began abusing drugs at age ten, (7) petitioner had genetic loading with a positive family history of drugs and alcohol, (8) petitioner developed insecure, isolated, unhealthy relationships, (9) petitioner was failure-oriented, possessed low self-concept, and felt hopeless, (10) petitioner learned inappropriate responses, behaviors, and beliefs, (11) petitioner's life view was one of hopelessness, lack of coping skills, poor judgment, and impaired decision-making ability, (12) petitioner had a distorted sense of reality and identity, low tolerance, no sense of direction or purpose, and inappropriate responses, (13) petitioner is emotionally damaged, disabled, and dysfunctional, uses illegal drugs to self-medicate to calm himself, and (14) petitioner was probably in a psychotic state at the time of the murders.[30]

#### B. *State Court Disposition*

During the punishment phase of petitioner's capital trial, the trial court held a hearing outside the presence of the jury during which Ms. Mockeridge testified concerning (1) her training and experience as a master's level social worker, licensed chemical dependency counselor, psychotherapist, and "mitigation specialist," (2) the extent of her efforts to investigate petitioner's background and to develop a psycho-social history of petitioner, (3) her opinion that petitioner was probably in a psychotic state at the time of his capital offense.[31] After hearing extensive argu-

---

29. Petition, docket entry no. 6, at pp. 8–17.

30. Affidavit of Linda Mockeridge, attached as Exhibit L to Petition, docket entry no. 6. Petitioner presented the same affidavit to the state courts during his state habeas corpus pro-

ceeding. State Habeas Transcript, at pp. 30–32.

31. S.F. Trial, Volume 24 of 26, testimony of Linda Mockeridge, at pp. 5–56.

ment from the parties regarding whether "mitigation science" was a legitimate field of scientific inquiry for which Ms. Mockeridge qualified as an "expert," the state trial judge (1) ruled "in an abundance of caution" that he would permit Ms. Mockeridge to testify as an expert but was not specifically finding her to be an expert as to "mitigation science" *per se*, (2) ruled inadmissible a summary chart prepared by Ms. Mockeridge which contained hearsay, and (3) advised the parties he would address the prosecution's concerns about Ms. Mockeridge's apparent plans to relate to the jury wholly hearsay information she had obtained from other sources on a question-by-question basis.[32]

Thereafter, petitioner called Ms. Mockeridge as a witness and she testified she had interviewed petitioner and his family and reviewed petitioner's school, jail, medical, and psychiatric records and opined that (1) petitioner had experienced many negative influences during his developmental years and (2) petitioner was probably in the midst of a substance-induced psychosis or delusional state at the time of his capital offense.[33] The state trial court repeatedly sustained the prosecution's hearsay objections whenever defense counsel attempted to elicit testimony from Ms. Mockeridge concerning the contents of petitioner's school, medical, or jail records and concerning the contents of her discussions with petitioner's family and friends.[34] On cross-examination, Ms. Mockeridge admitted (1) she was unaware of the legal definition of "mitigating evidence" until the date of petitioner's trial, (2) a "mitigation specialist" does basically the same thing as a social worker, i.e., investigate a person's background for the purpose of developing a psycho-social history of that person, and

(3) she had not reviewed any of the police reports or other evidence relating to petitioner's capital offense.[35]

Petitioner's trial counsel made no effort whatsoever to elicit any opinion testimony from Ms. Mockeridge along the lines of that contained in the affidavit petitioner later presented to the state habeas court and to this Court, i.e., addressing her opinions concerning the impact of the many negative influences occurring during petitioner's childhood on petitioner's psychological and social development. More specifically, petitioner made no effort at trial to elicit testimony from Ms. Mockeridge with regard to her opinions that petitioner (1) felt abandoned and lacked a sense of trust, (2) as a child, was preoccupied and oriented to a survival mode, (3) lacked good coping skills, (4) had trust and abandonment issues and the needs to belong and for safety, (5) developed insecure, isolated, unhealthy relationships, (6) was failure-oriented, possessed low self-concept, and felt hopeless, (7) learned inappropriate responses, behaviors, and beliefs, (8) had a life view characterized by hopelessness, lack of coping skills, poor judgment, and impaired decision-making ability, (9) had a distorted sense of reality and identity, low tolerance, no sense of direction or purpose, and inappropriate responses, and (10) was emotionally damaged, disabled, and dysfunctional, and used illegal drugs to self-medicate to calm himself.

Petitioner's trial counsel likewise made no effort to introduce properly authenticated copies of petitioner's relevant school, medical, jail, and other records relied upon by Ms. Mockeridge in the course of developing her psycho-social history of petitioner. Likewise, petitioner's trial coun-

---

32. S.F. Trial, Volume 24 of 26, at pp. 57–72.

33. S.F. Trial, Volume 24 of 26, testimony of Linda Mockeridge, at pp. 113–32.

34. *Id.*, at pp. 122–23, 128–29, 132.

35. *Id.*, at pp. 134–51.

sel made no effort to introduce any testimony from petitioner's family, friends, or others possessing *personal* knowledge regarding the circumstances of petitioner's allegedly difficult childhood. Instead, petitioner's trial counsel attempted, unsuccessfully, to employ Ms. Mockeridge's status as an "expert" witness to circumvent the Hearsay Rule and introduce rank hearsay information about petitioner's childhood through her trial testimony. The state trial court sustained the prosecution's hearsay objections to these attempts, as well as the prosecution's hearsay objections to Ms. Mockridge's written report and a summary chart detailing the information she had acquired while developing her psycho-social history of petitioner. In sum, while the state trial court permitted Ms. Mockeridge to express some of her expert opinions regarding the negative influences affecting petitioner's development and petitioner's likely mental condition at the time of his offense, the state trial court excluded any and all hearsay testimony by Ms. Mockeridge detailing precisely what information she had relied upon in arriving at her opinions.

For unknown reasons, petitioner's trial counsel made no effort to introduce in admissible form any of the underlying evidence relied upon by Ms. Mockeridge in the course of developing her expert opinions. For instance, petitioner's trial counsel made no effort to secure and introduce certified, or otherwise properly authenticated, copies of the petitioner's birth, school, medical, mental health, juvenile, residency, or jail records relied upon by Ms. Mockeridge in formulating her expert opinions. Likewise, petitioner's trial counsel called no witnesses possessing personal knowledge regarding the details of petitioner's allegedly deprived childhood relied

upon by Ms. Mockeridge in developing her psycho-social history of petitioner.

Petitioner's trial counsel voiced no objection to any of the trial court's evidentiary rulings concerning Ms. Mockeridge. Petitioner's trial counsel made no proffer of *additional* opinion testimony from Ms. Mockeridge along the lines of that contained in her affidavit now before this Court. After the jury began its deliberations at the punishment phase of petitioner's capital trial, petitioner did move for the admission of Ms. Mockeridge's written report, as well as her summary chart, and the trial court admitted both for purposes of the record.[36]

Petitioner raised no point of error on direct appeal complaining about the trial court's rulings with regard to Ms. Mockedridge's testimony, report, or chart.

In his original state habeas corpus application, however, he complained for the first time that the trial court's rulings regarding Ms. Mockeridge's testimony had effectively precluded petitioner from presenting "mitigating" evidence to his capital sentencing jury.[37]

The state habeas trial court (1) found the trial court had ruled that Ms. Mockeridge, while not specifically determined to be an expert on mitigation, would be permitted to testify as an expert, (2) found the trial court sustained the prosecution's hearsay objection to Ms. Mockeridge's summary chart, (3) found Ms. Mockeridge was permitted to testify regarding the nature of the documents and other evidence she had reviewed while developing her psycho-social history of petitioner but was not allowed to testify as to the specific contents of those hearsay documents and conversations, (4) found Ms. Mockeridge was permitted to express her opinions that

---

**36.** S.F. Trial, Volume 24 of 26, at pp. 199–201.

**37.** State Habeas Transcript, at pp. 12–21.

numerous negative factors impacted on petitioner's childhood development and that petitioner was probably "in the midst of a substance[-]induced psychosis" at the time of his offense, (5) found any confusion in the trial court's rulings regarding Ms. Mockeridge's testimony excluded only hearsay testimony on her part and not any expression of her expert opinions, (6) found petitioner never complained to the trial court that its rulings had impacted on petitioner's constitutional right to present mitigating evidence, (7) concluded petitioner had procedurally defaulted on his constitutional complaint regarding the trial court's rulings on Ms. Mockeridge's testimony by failing to timely make a bill of exceptions regarding same and failing to present those complaints on direct appeal, (8) alternatively concluded there was no error in the trial court's rulings on the proper scope of Ms. Mockeridge's testimony.[38] The Texas Court of Criminal Appeals subsequently adopted the trial court's findings and conclusions when it denied state habeas corpus relief. *Ex parte Kevin Watts,* WR–62,650–01 & WR–62,650–02 (Tex.Crim.App. October 17, 2005).

### C. *Procedural Default*

Respondent correctly points out that petitioner procedurally defaulted on his complaints concerning the trial court's rulings on Ms. Mockeridge's testimony by failing to timely object on constitutional grounds to same and, thereafter, failing to raise points of error on direct appeal challenging the trial court's rulings.

#### 1. *Failure to Make a Contemporaneous Objection*

■ Petitioner's failure to contemporaneous object to the state trial court's allegedly "limiting" rulings regarding the admissibility of Ms. Mockeridge's testimony,

written report, and summary chart constitutes a form of procedural default, which serves as a barrier to federal habeas review of this claim. *See Johnson v. Cain,* 215 F.3d 489, 495 (5th Cir.2000) (holding a federal district court may raise the issue of procedural default *sua sponte); Magouirk v. Phillips,* 144 F.3d 348, 358 (5th Cir.1998)(holding the same). In point of fact, petitioner failed to make any proffer at trial, and likewise failed to obtain a state trial court ruling specifically addressing the admissibility, of the additional opinion testimony contained in Ms. Mockeridge's affidavit now before this Court. Simply put, the state trial court never had an opportunity to address specifically the admissibility. of Ms. Mockeridge's *additional* opinion testimony, proffered for the first time in her affidavit which accompanied petitioner's initial state habeas corpus application.

■ Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim.

---

**38.** State Habeas Transcript, at pp. 184–94.

*Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

Petitioner alleges no facts, and cites this Court to no Texas case law, showing the Texas courts have inconsistently applied the contemporaneous objection rule in similar contexts, i.e., with regard to alleged errors in the admission of evidence. More specifically, petitioner identifies no instances in which the Texas Court of Criminal Appeals has entertained the merits of a claim challenging the constitutionality of a state trial court's ruling on the admissibility of potentially mitigating evidence at the punishment phase of a capital trial when raised for the first time in a state habeas corpus application. The Fifth Circuit has long recognized a federal habeas petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review. *See Rowell v. Dretke,* 398 F.3d 370, 375–75 (5th Cir.2005) (holding a defendant's failure to timely object to alleged errors in a jury charge determined by a Texas appellate court to be a violation of the Texas contemporaneous objection rule barred federal habeas relief of the alleged erroneous jury charge under the procedural default doctrine), *cert. denied,* — U.S. ——, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005); *Graves v. Cockrell,* 351 F.3d 143, 152 (5th Cir. 2003) (Texas contemporaneous objection rule is an adequate and independent state ground and failure to comply with this rule procedurally bars federal habeas review), *cert. denied,* 541 U.S. 1057, 124 S.Ct. 2160, 158 L.Ed.2d 757 (2004); *Cotton v. Cockrell,* 343 F.3d 746, 754 (5th Cir.2003) (holding violation of the Texas contemporaneous objection rule is an adequate and independent barrier to federal habeas review), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Dowthitt v. Johnson,* 230 F.3d 733, 752 (5th Cir.2000)(holding the Texas contemporaneous objection rule is strictly or regularly and evenhand-

edly applied in the vast majority of cases and, therefore, an adequate state bar), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Barrientes v. Johnson,* 221 F.3d 741, 779 (5th Cir.2000)(failure to timely object waives error in jury instructions unless the error is so prejudicial no instruction could cure the error), *cert. denied,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir. 1998) (Texas courts strictly and regularly apply the Texas contemporaneous objection rule which is an adequate state procedural rule), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Sharp v. Johnson,* 107 F.3d 282, 285–86 (5th Cir. 1997) (holding the Texas contemporaneous objection rule is an independent and adequate state ground upon which to base a procedural bar to federal review); *Rogers v. Scott,* 70 F.3d 340, 342 (5th Cir.1995)(holding a federal habeas petitioner's failure to comply with the Texas contemporaneous objection rule also bars federal habeas review of a claim absent cause and prejudice or a fundamental miscarriage of justice), *cert. denied,* 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996); *Nichols v. Scott,* 69 F.3d 1255, 1278 n. 44 (5th Cir.1995) (holding the same), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *Amos v. Scott,* 61 F.3d 333, 338–45 (5th Cir.1995)(holding the same), *cert. denied,* 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995).

More importantly, the Fifth Circuit has recognized the efficacy of the Texas contemporaneous objection rule as a barrier to federal habeas review was "firmly established" for federal procedural default purposes long before the date petitioner filed his brief on direct appeal. *See Hogue v. Johnson,* 131 F.3d 466, 487 (5th Cir. 1997) (holding the Texas contemporaneous objection rule was already well established 35 years ago and recognized as an ade-

quate state procedural barrier to federal habeas review at least twenty years ago), *cert. denied,* 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 334 (1998); *Rogers v. Scott,* 70 F.3d at 342 (recognizing the Texas contemporaneous objection rule foreclosed federal habeas review); *Amos v. Scott,* 61 F.3d at 343–44 (holding Texas appellate courts consistently apply the contemporaneous objection rule in the vast majority of cases and, thereby, strictly and regularly apply same).

Petitioner's trial counsel wholly failed to present the trial court with any opportunity to rule on the admissibility of Ms. Mockeridge's *additional* opinion testimony, i.e., that contained in her affidavit now before this Court. Petitioner failed to obtain a state trial court ruling regarding the admissibility of the vast bulk of Ms. Mockeridge's recently-proffered opinion testimony and failed to object to any ruling by the trial court purporting to limit the scope of Ms. Mockeridge's opinion testimony. For those reasons, petitioner procedurally defaulted on his first claim for federal habeas relief herein.

### 2. *Failure to Raise Claim on Direct Appeal*

██ Likewise, the Fifth Circuit has long recognized the efficacy of the Texas procedural rule requiring presentation of claims about allegedly erroneous trial court rulings on direct appeal. Petitioner identifies no instances in which the Texas Court of Criminal Appeals has entertained the merits of a federal constitutional claim about a state trial court's allegedly erroneous evidentiary ruling when that claim was raised for the first time in a state habeas corpus application. More importantly, the Fifth Circuit has recognized that the same procedural default rule relied upon by the Texas Court of Criminal Appeals in its adopted findings and conclusions denying petitioner state habeas corpus relief was "firmly established" for federal procedural

default purposes before the date the Texas Court of Criminal Appeals disposed of petitioner's direct appeal. *See Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir.2004), (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex.Crim.App.1996) *modified* on motion for rehearing on February 2, 1998, to recognize this new procedural default rule, "firmly entrenched" that procedural default rule on that date), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001) (holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson,* 207 F.3d 232, 249 (5th Cir.2000) (holding a federal habeas petitioner procedurally defaulted on a fair cross-section complaint by failing to raise it in a direct appeal that became final in 1997), *cert. denied,* 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000). At the time petitioner filed his appellant's brief the law in Texas, as established on rehearing in *Ex parte Gardner,* required a convicted criminal defendant to present any and all claims then available as points of error on direct appeal. *Id.* For unknown reasons, petitioner's appellate counsel failed to assert petitioner's complaint regarding the trial court's rulings on Ms. Mockeridge's testimony as a point of error on direct appeal. Thus, petitioner has procedurally defaulted on this claim in this Court.

Petitioner has twice procedurally defaulted on his *federal* claim arising from the trial court's allegedly restrictive or limiting rulings on Ms. Mockeridge's testimony.

### 3. *Exceptions Inapplicable*

Petitioner's failures to make a timely *constitutional* objection to the state trial

court's allegedly "restrictive" or "limiting" rulings on the admissibility of Ms. Mockeridge's punishment-phase testimony or to raise points of error complaining about same on direct appeal bar federal habeas review of petitioner's constitutional challenge to those rulings unless petitioner can satisfy one of the two exceptions to the procedural default doctrine.

 The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, petitioner does not allege any specific facts in this Court establishing that his trial counsel's failure to assert a constitutional challenge to the trial court's rulings on Ms. Mockerdige's testimony or his appellate counsel's failure to present points of error on direct appeal complaining about same satisfy either

prong of the *Strickland v. Washington* test for ineffective assistance.

 In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley,* 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley,* 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. At the punishment phase of petitioner's capital trial, Ms. Mockeridge made the jury aware of the fact there had been many negative influences on petitioner's childhood development.[39] Petitioner's cousins informed the jury the petitioner was involved with gangs and drugs by the time he arrived in Texas at age fourteen.[40] Thus, Ms. Mockeridge's additional opinion testimony, proffered in her affidavit, offers little in the way of *additional* substantive evidence regarding petitioner's background or moral culpability for his capital offense sufficient to have earned petitioner a life sentence.

---

**39.** S.F. Trial, Volume 24 of 26, testimony of Linda Mockeridge, at pp. 130–31.

**40.** S.F. Trial, Volume 23 of 26, testimony of Sonia Watts, at pp. 171–72, 205; testimony of Ronald Melvin Watts, at pp. 227–28.

■ Given the record now before this Court which establishes the heinous nature of petitioner's offense, petitioner's equally remorseless conduct toward Hye Kyong Kim in the hours after his capital offense, and petitioner's complete failure to express any genuine remorse personally or to make a sincere personal expression of contrition for his murderous conduct before the jury, petitioner has failed to establish by "clear and convincing evidence" that, but for the trial court's allegedly erroneous evidentiary rulings, no reasonable jury could have found him eligible for the death sentence. In short, the evidence of petitioner's long history of violent behavior, propensity for future criminal conduct, and utter lack of remorse for his criminal misbehavior was overwhelming. Even considering petitioner's additional opinion testimony from Ms. Mockeridge, in the absence of any scintilla of evidence showing the petitioner ever personally expressed remorse for his capital offense before his capital sentencing jury, there is not even a remote possibility, much less clear and convincing evidence, that, but for the absence of Ms. Mockeridge's additional opinion testimony, a rational jury could have found petitioner ineligible for the death penalty. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice exception to the procedural default doctrine.

### D. *No Merits*

■ Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of

the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law). In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874. "When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.' The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*." *Coleman v. Thompson*, 501 U.S. at 730, 111 S.Ct. at 2554. A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir.2000); *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir.1999). The failure to admit evidence amounts to a due process violation only when the omitted evidence is a crucial, critical, highly significant factor in the context of the entire trial. *Johnson v. Puckett*, 176 F.3d at 821. Thus, the question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether petitioner's federal constitutional rights were violated

by any ruling made by the trial court in admitting or excluding evidence actually proffered for admission during petitioner's trial. *See Bigby v. Dretke,* 402 F.3d 551, 563 (5th Cir.2005) (holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied,* —— U.S. ——, 126 U.S. 239, 163 L.Ed.2d 221 (2005).

■ None of the many Supreme Court opinions cited by petitioner in support of his first claim for relief herein holds that the Eighth Amendment abrogates state evidentiary rules, including the Hearsay Rule. On the contrary, the Fifth Circuit has upheld against a due process challenge a state trial court's exclusion during the punishment phase of a capital trial of an expert's proffered hearsay testimony regarding out-of-court statements made to the expert by the defendant. *See McGinnis v. Johnson,* 181 F.3d 686, 693 (5th Cir.1999) (holding there was no due process violation where the state trial court permitted the expert to testify as to his opinions about the petitioner's state of mind during and after the crime arising from petitioner's statements to the expert but excluded the petitioner's statements to the expert), *cert. denied,* 528 U.S. 1125, 120 S.Ct. 955, 145 L.Ed.2d 829 (2000). The Fifth Circuit's holding in *McGinnis* controls the disposition of petitioner's initial claim for relief herein. Petitioner's trial court (1) permitted Ms. Mockeridge to opine regarding her beliefs that (a) petitioner had been negatively impacted by numerous factors during his childhood and (b) petitioner was likely suffering from substance-induced psychosis at the time of his capital offense but (2) refused to permit Ms. Mockeridge to testify regarding hearsay statements made to her by petitioner and others or about hearsay information contained in documents petitioner never proffered for admission in properly authenticated form.

The state trial court's rulings concerning Ms. Mockeridge's testimony did not render petitioner's trial fundamentally unfair. Petitioner's trial counsel made no effort whatsoever to elicit any *opinion* testimony from Ms. Mockeridge along the lines of that contained in her affidavit now before this Court. More specifically, petitioner made no effort at his trial to present the jury with opinion testimony by Ms. Mockeridge regarding the impact of the many negative influences on petitioner's development on petitioner's character. For instance, Ms. Mockeridge opines in her affidavit that petitioner suffered from (1) feelings of hopelessness, abandonment, and isolation, (2) a pathological need for belonging, (3) a lack of coping skills, (4) an inability to engage in appropriate behavior, (5) emotional damage, and (6) a preoccupation with survival behavior. However, petitioner's trial counsel made no effort to elicit similar testimony from Ms. Mockeridge during the punishment phase of petitioner's trial. Petitioner cannot fault the state trial court for what was apparently the wholesale deficient performance of his trial counsel in failing to either (1) attempt to elicit similar testimony or (2) obtain a clarifying ruling from the trial court regarding the admissibility of such testimony. It is disingenuous for petitioner to make no effort to secure a specific trial court ruling on the admissibility of particular opinion testimony and then to complain the trial court's allegedly ambiguous rulings on hearsay matters somehow dissuaded petitioner from even offering that same opinion testimony.

■ When viewed in the context of petitioner's entire trial, there was nothing crucial, critical, or highly significant about any of the additional *opinion* testimony from Ms. Mockeridge petitioner now claims he was somehow prevented from eliciting from that witness during the pun-

ishment phase of his capital trial. It is significant that the trial court's only rulings *excluding* testimony by Ms. Mockeridge addressed efforts by petitioner's trial counsel to do an end-run around the Hearsay Rule by having Ms. Mockeridge testify as to information which she either (1) was told by petitioner or his family or (2) read in wholly hearsay documents which had never been proffered for admission into evidence at petitioner's trial. The state trial court cannot reasonably be faulted for enforcing the Texas Hearsay Rule. Nor can the state trial court be faulted for "excluding" Ms. Mockeridge's opinion testimony where (1) the trial court permitted her to testify fully concerning her opinion of the petitioner's mental state at the time of his offense and (2) the petitioner made no effort at trial to offer additional *opinion* testimony from Ms. Mockeridge concerning the other matters set forth in her post-trial affidavit. While petitioner correctly argues the Eighth Amendment ensures a capital defendant the opportunity to present relevant mitigating evidence, nothing in the federal Constitution abrogates state evidentiary rules. *See McGinnis v. Johnson,* 181 F.3d at 693 (holding there was no violation of due process where a defense expert was permitted to testify at the punishment phase of a capital trial regarding his opinion of the defendant's mental state at the time of the offense but was precluded from testifying regarding the specific contents of hearsay statements made by the defendant which helped form the basis for the expert's opinion).

### E. *Conclusions*

Petitioner procedurally defaulted on his initial claim for federal habeas relief herein by failing to timely object to, or otherwise properly preserve for state appellate review, his complaint about the trial court's allegedly limiting rulings regarding Ms. Mockeridge's testimony. In fact, petitioner made no effort to obtain a ruling from the trial court on the admissibility of the vast majority of Ms. Mockeridge's opinion testimony which petitioner now claims he was somehow precluded from introducing at trial. Furthermore, petitioner procedurally defaulted a second time on this same claim of allegedly erroneous trial court evidentiary rulings by failing to raise his complaints on direct appeal. Petitioner has alleged no specific facts sufficient to overcome either of his two, separate, procedural defaults on his first federal habeas claim. The state habeas court's alternative conclusion that petitioner's federal constitutional rights were not violated by the trial court's evidentiary rulings is consistent with the Fifth Circuit's squarely-on-point holding in *McGinnis.* Under such circumstances, the state habeas court's alternative ruling that there was no federal constitutional error arising from the trial court's rulings on the admissibility of Ms. Mockeridge's testimony, written report, and summary chart was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### IV. *Dawson v. Delaware Claim*

### A. *The Claim*

In his second claim herein, petitioner argues his First Amendment rights, as recognized by the Supreme Court in *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), were violated when the trial court admitted the letter petitioner wrote to his cousin from jail while awaiting trial for capital murder, which contained several ethnic slurs and indicated petitioner's desire to assault others and join a prison gang identified there-

in by petitioner as the "Black Gorilla Family," i.e., State Exhibit No. 105–A.[41]

### B. *State Court Disposition*

When the prosecution offered State Exhibit no. 105–A at trial, the only objections petitioner's trial counsel raised were arguments that jail personnel had unlawfully tampered with, examined, and seized petitioner's private correspondence.[42] At no time did petitioner's trial counsel raise an objection that the admission of State Exhibit no. 105–A violated petitioner's First Amendment right to association recognized by the Supreme Court's holding in *Dawson v. Delaware.*

In his first point of error on direct appeal, petitioner argued the state trial court violated the Supreme Court's holding in *Dawson v. Delaware* when it admitted evidence of petitioner's desire for membership in "a black racist prison gang." The Texas Court of Criminal Appeals (1) found petitioner never objected at trial to the admission of State Exhibit no. 105–A on *Dawson* or First Amendment grounds, (2) found petitioner's trial objections to the admission of State Exhibit no. 105–A and to related testimony made no mention of gang membership, and (3) concluded petitioner failed to properly preserve for state appellate review any federal constitutional objection to the admission of State Exhibit no. 105–A or any trial testimony concerning same.[43]

In his initial state habeas corpus application, petitioner again urged his complaint that the admission of State Exhibit no. 105–A violated his federal constitutional right to association.[44] The state habeas trial court (1) found petitioner's trial counsel first raised the issue of gang membership at trial, (2) found there was no dispute that petitioner had admitted to having been a member of the Longview Crips street gang, (3) found no evidence was admitted identifying either the Longview Crips, i.e., the California street gang to which petitioner admitted once having been a member, or the Black Gorilla Family, i.e., the prison gang to which petitioner wrote he planned to seek membership, as "racist" gangs, (4) found petitioner made no constitutional objection to the admission of any evidence showing petitioner was either a member of the Longview Crips or hoped to one day be a member of the Black Gorilla Family, (5) concluded the Texas Court of Criminal Appeals had held on direct appeal that petitioner procedurally defaulted on this same constitutional claim by failing to timely object at trial to the admission of State Exhibit no. 105–A on the same ground as that now urged by petitioner, and (6) alternatively concluded no constitutional error arose from the admission of State Exhibit no. 105–A.[45]

### C. *Procedural Default*

 Respondent correctly argues that petitioner has procedurally defaulted on this claim by failing to timely object at trial to the admission of State Exhibit no. 105–A on the same federal constitutional ground petitioner initially urged on direct appeal and now urges before this Court.

 Generally speaking, Texas law requires an objection to coincide with a point of error on direct appeal. *See, e.g., Guevara v. State,* 97 S.W.3d 579, 583 (Tex.

---

41. Petition, docket entry no. 6, at pp. 17–18.

42. S.F. Trial, Volume 23 of 26, testimony of Mark Wells, at pp. 81–94.

43. *Watts v. State,* AP–74,593 (Tex.Crim.App. December 15, 2004). A copy of this unpublished opinion is attached to Petitioner's Petition herein at exhibit B.

44. State Habeas Transcript, at pp. 21–23.

45. State Habeas Transcript, at pp. 196–202.

Crim.App.2003), (defendant failed to preserve complaint regarding the admission of victim-impact evidence by objecting thereto only on the ground that the witness was unqualified to render an opinion regarding the impact of the crime on the victim's personality);. *Ibarra v. State*, 11 S.W.3d 189, 196–97 (Tex.Crim.App.1999) (holding a hearsay objection did not preserve for appellate review a complaint that the testimony in question was irrelevant), cert. denied, 531 U.S. 828, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000). The Texas Court of Criminal Appeals' determination on direct appeal, as well as the state habeas court's similar determination, that petitioner's trial counsel's objections to the petitioner's allegedly improperly-seized correspondence failed to properly preserve petitioner's constitutional complaint about the admission of State Exhibit no. 105–A appear to be straight-forward applications of this "firmly established and regularly followed" principle of state criminal procedure.

By failing to present the trial court with a contemporaneous objection to the admission of State Exhibit no. 105–A which mirrored the First Amendment complaints petitioner subsequently presented on direct appeal and in his state habeas corpus proceeding, petitioner procedurally defaulted on his *Dawson v. Delaware* claim in this federal habeas corpus proceeding.

### D. *No Merits*

■ In *Dawson v. Delaware*, the Supreme Court specifically held that it is proper for a capital sentencing jury to consider evidence of the defendant's racial intolerance and subversive advocacy where such evidence is relevant to the issues before the jury. *Dawson v. Delaware*, 503 U.S. at 164–65, 112 S.Ct. at 1097. The particular evidence in that case, i.e., Dawson's membership in the Aryan Brotherhood, was unaccompanied by any showing Dawson's capital offense was racially motivated or in anyway endorsed by the Aryan

Brotherhood and was not relevant to rebut any mitigating evidence proffered by the defense; therefore, the Supreme Court concluded, the evidence was irrelevant to any issue before the sentencing jury. *Id.*, 503 U.S. at 166–67, 112 S.Ct. at 1098–99. The Supreme Court took great pains in *Dawson*, however, to explain the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the Constitution. *Id.*, 503 U.S. at 165, 112 S.Ct. at 1097. The constitutional flaw in the prosecution's reliance on Dawson's membership in the Aryan Brotherhood, the Supreme Court explained, was the prosecution's failure to introduce other evidence tying Dawson's membership to any of the considerations before the sentencing jury. *Id.*, 503 U.S. at 166–67, 112 S.Ct. at 1097–98.

■ In contrast to the circumstances of *Dawson*, evidence of petitioner's intense racial animus against Hispanics and Anglos was relevant to rebut the defense's contention that petitioner's assaults on Hispanic inmates and threats against Anglo guards while petitioner was in pretrial detention were all instances of self-defense undertaken by petitioner as a result of petitioner's fear of assault by inmates who were acting at the behest of the Mexican Mafia prison gang. Furthermore, as correctly pointed out by respondent, unlike in *Dawson*, the record from petitioner's trial was bereft of any evidence identifying the "Black Gorilla Family" referenced in petitioner's epithet-laced letter as a "racist" organization. In fact, there was no evidence introduced at petitioner's trial identifying any of the racial tenets or policies of that organization or of the street gang (the "Longview Crips") to which petitioner admitted to having been a member. In sum, State Exhibit no. 105–A's evidence

of petitioner's racial animus toward Hispanics and Anglos was relevant to rebut petitioner's contention that his lengthy record of violence during his pretrial detention was solely the product of petitioner's fear of assault by Mexican Mafia prison gang members.

 Moreover, the erroneous admission of prejudicial evidence can justify federal habeas corpus relief only if it is material in the sense that it is a crucial, critical, or highly significant factor to the outcome of the trial. *Givens v. Cockrell,* 265 F.3d 306, 308 (5th Cir., 2001); *Jackson v. Johnson,* 194 F.3d 641, 656 (5th Cir. 1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000); *Little v. Johnson,* 162 F.3d 855, 862 (5th Cir., 1998), *cert. denied,* 526 U.S. 1118, 119 S.Ct. 1768, 143 L.Ed.2d 798 (1999). Petitioner's mention of his desire to join the "Black Gorilla Family" upon his arrival in prison was only one small fragment of a racial-epithet-strewn letter petitioner wrote to his cousin while awaiting trial for capital murder and was unaccompanied by any evidence identifying the "Black Gorilla Family" as an organization which harbored or promoted racial animus toward other ethnic groups. The evidence before the jury during the punishment phase of petitioner's capital trial consisted of (1) the horrific details of petitioner's capital offense (including the fact he shot three people execution-style *before* demanding any money), (2) the equally abhorrent details of petitioner's hours-long, cocaine-fueled, sexual rampage against his kidnap victim, (3) the uncontroverted eyewitness testimony of multiple law enforcement officers regarding petitioner's efforts to ram the stolen vehicle he was driving into multiple police vehicles during petitioner's unsuccessful attempt to flee with his kidnap victim, (4) multiple eyewitness accounts of petitioner's alcohol, cocaine, and prescription medication binge the night before his capital offense, (5) accounts of petitioner's physical assaults on other jail inmates while awaiting trial, (6) accounts of petitioner's history of physical assaults upon a law enforcement officer and a pair of women, including his own common law spouse, and (7) a complete and total absence of any evidence showing petitioner had ever personally expressed sincere remorse or genuine contrition for his capital offense before his capital sentencing jury. Under such circumstances, the admission of State Exhibit no. 105–A and its vague reference to the "Black Gorilla Family" was neither a crucial, critical, nor highly significant factor in the outcome of the punishment phase of petitioner's capital trial.

Finally, the Supreme Court left open in *Dawson* the question of whether the admission of evidence of Dawson's gang membership might have been harmless error. Having independently reviewed the entire record from petitioner's trial, this Court concludes the admission of State Exhibit no. 105–A had no "substantial and injurious effect or influence" in determining the jury's verdict at the punishment phase of petitioner's capital trial. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)(holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict").

### E. *Conclusions*

Petitioner procedurally defaulted on his *Dawson v. Delaware* complaint regarding the admission of petitioner's racial epithet-strewn letter to his cousin by failing to make a contemporaneous objection at trial raising this same constitutional claim. The state habeas court's alternative holding that no federal constitutional violation resulted from the admission of State Exhibit no. 105–A was neither contrary to,

nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## V. Improper Prosecutorial Argument

### A. The Claim

In his third and final claim for federal habeas relief herein, petitioner argues the prosecution improperly "stirred the racism pot" by referring to petitioner's letter and desire to join the "Black Gorilla Family" prison gang.[46]

### B. State Court Disposition

During closing argument at the punishment phase of petitioner's capital trial, the prosecution argued in part *without objection from petitioner's trial counsel* that (1) petitioner was an admitted gang member and (2) petitioner's expressed desire to join a prison gang indicated petitioner posed a threat of future dangerousness while incarcerated, as did the multiple racist references in petitioner's letter.[47]

On direct appeal, the Texas Court of Criminal Appeals held petitioner procedurally defaulted, i.e., failed to preserve error, on his complaints about the prosecution's references to petitioner's gang membership during punishment-phase closing argument by failing to timely object thereto.[48] During petitioner's state habeas corpus proceeding, the state habeas trial court reached the same conclusion when petitioner re-urged his complaints about the prosecution's closing punishment-phase jury argument and concluded, alternatively, the prosecution's closing ar-

guments were proper summations of the evidence then before the jury.[49]

### C. Procedural Default

■ Respondent correctly points out petitioner's failure to contemporaneously object to the prosecution's closing argument constitutes a procedural default which bars federal habeas review of same. The Fifth Circuit has recognized the efficacy of the Texas contemporaneous objection rule as a barrier to federal habeas review as "firmly established" for federal procedural default purposes long before the date of petitioner's trial. *See Hogue v. Johnson*, 131 F.3d at 487 (holding the Texas contemporaneous objection rule was already well established 35 years ago and recognized as an adequate state procedural barrier to federal habeas review at least twenty years ago); *Rogers v. Scott*, 70 F.3d at 342 (recognizing the Texas contemporaneous objection rule foreclosed federal habeas review); *Amos v. Scott*, 61 F.3d at 343–44 (holding Texas appellate courts consistently apply the contemporaneous objection rule in the vast majority of cases and, thereby, strictly and regularly apply same).

### D. No Merit

■ Under Texas law, proper closing argument by the prosecution in criminal trials fall into four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App. 2000), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001); *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App.

---

**46.** Petition, docket entry no. 6, at pp. 19–22.

**47.** S.F. Trial, Volume 24 of 26, at pp. 161–63, 166, 191, 196.

**48.** *Watts v. State*, AP–74,593 (Tex.Crim.App. December 15, 2004), *slip op.* at p. 3.

**49.** State Habeas Transcript, at pp. 202–03.

1999), *cert. denied,* 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000); *Hathorn v. State,* 848 S.W.2d 101, 117 (Tex.Crim.App. 1992), *cert. denied,* 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). *See also Buxton v. Collins,* 925 F.2d 816, 825 (5th Cir.1991)(recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement), *cert. denied,* 498 U.S. 1128, 111 S.Ct. 1095, 112 L.Ed.2d 1197 (1991).

■ An improper prosecutorial argument which does not implicate a specific constitutional provision is not cognizable on collateral review unless the defendant shows an abridgment of due process, i.e., the improper argument rendered the proceeding fundamentally unfair. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)("it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant inquiry is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process"); *Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir.2002)(holding prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial they render the trial fundamentally unfair and such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that, in probability, but for the remarks no conviction would have occurred), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Dowthitt v. Johnson,* 230 F.3d 733, 755 (5th Cir.2000)(holding (1) the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process and (2) the prosecutor is permitted to argue to the jury those inferences and conclusions the prosecutor wishes the jury to draw from the evidence so long as those inferences are grounded upon evidence), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Barrientes v. Johnson,* 221 F.3d 741, 753 (5th Cir.2000)(holding (1) federal habeas review of allegedly improper prosecutorial statements made during the punishment phase of a capital trial focuses on whether the remarks so infected the punishment phase as to make the resulting sentence a denial of due process and (2) a trial is fundamentally unfair only if there is a reasonable probability the verdict might have been different had the trial been properly conducted), *cert. dism'd,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001).

■ Improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *Id.* To establish that a prosecutor's remarks are so inflammatory, the petitioner must demonstrate the misconduct is persistent and pronounced or the evidence of guilt was so insubstantial the conviction would not have occurred but for the improper remarks. *Harris v. Cockrell,* 313 F.3d at 245; *Turner v. Johnson,* 106 F.3d 1178, 1188 (5th Cir.1997); *Nichols v. Scott,* 69 F.3d 1255, 1278 (5th Cir.1995)(wholly apart from the issue of procedural bar, failure to object to an argument is an indication it was not perceived as having a substantial adverse effect or would not naturally and necessarily be understood as advancing improper considerations)(*citing Milton v. Procunier,* 744 F.2d 1091, 1095 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985)), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559,

135 L.Ed.2d 1076 (1996); *Buxton v. Collins,* 925 F.2d at 825 (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement).

██ "A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Harris v. Cockrell,* 313 F.3d at 245 n. 12; *Ortega v. McCotter,* 808 F.2d 406, 410 (5th Cir.1987), *quoting Menzies v. Procunier,* 743 F.2d 281, 288–89 (5th Cir. 1984). The burden is on the habeas petitioner to show a reasonable probability that, but for the prosecutor's remarks, the result of the trial would have been different. *Nichols v. Scott,* 69 F.3d at 1278.

██ The prosecutor's allegedly objectionable arguments did not so infect petitioner's trial was to render same fundamental unfair. The state habeas court reasonably concluded the prosecutor's comments were fair summations of, and drew reasonable, fair, legitimate inferences from, the evidence then before the jury. There was overwhelming evidence favoring the prosecution on both of petitioner's capital sentencing special issues. In addition to the heinous details of petitioner's capital offense and torture of his kidnap victim, the jury had before it at the punishment phase of petitioner's trial unchallenged testimony establishing the petitioner (1) aggressively attempted to flee from police when they encircled the stolen vehicle he was driving, (2) had a long history of violent behavior, both while in detention and on the street, and (3) had a drug-abuse problem of long duration for which petitioner had sought no treatment during his previous incarcerations and periods on probation. Under such circumstances, the prosecutors' passing references to the petitioner's use of racial epithets and expression of his desire to join a prison gang did not render petitioner's trial fundamentally unfair.

### E. Conclusions

Petitioner procedurally defaulted on his complaints about the prosecution's punishment-phase closing argument by failing to contemporaneously object thereto. The state habeas court's alternative conclusion that no federal constitutional violation resulted from the prosecutor's closing jury arguments was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## VI. *Certificate of Appealability*

██ The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

■ Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell*, 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n. 10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

■ A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Ten-*

*nard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir.2000).

■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell*, 537 U.S. at 338, 123 S.Ct. at 1040 (quoting *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1)

the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Cardenas v. Dretke*, 405 F.3d 244, 248 (5th Cir. 2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 2986, —— L.Ed.2d —— (2006); *Miller v. Dretke*, 404 F.3d 908, 913 (5th Cir. 2005); *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 550, 163 L.Ed.2d 466 (2005); *Bigby v. Dretke*, 402 F.3d 551, 557 (5th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 239, 163 L.Ed.2d 221 (2005); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir.2004), *cert. denied*, 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005).

Petitioner procedurally defaulted on all three of his claims herein by failing to contemporaneously object *on the same federal constitutional grounds* petitioner urges herein to either (1) the trial court's rulings regarding the admissibility of Ms. Mockeridge's testimony, report, or chart, (2) the admission of State Exhibit no. 105–A, or (3) the prosecution's closing punishment-phase jury arguments. There can be no genuine dispute among reasonable jurists as to the nature of petitioner's procedural default on each of his claims herein.

Furthermore, there can be no disagreement among reasonable jurists as to the utter lack of merit underlying each of petitioner's federal constitutional claims herein. Nothing other than the deficient performance of petitioner's trial counsel prevented petitioner from introducing the additional opinion testimony of Ms. Mockeridge which petitioner contends he was precluded from presenting at trial. This Court's independent review of the record from petitioner's trial leads to the inescapable conclusion the state trial judge invited petitioner to present expert testimony from Ms. Mockeridge and announced a desire to exclude only that testimony which was barred by the Hearsay Rule. If petitioner's trial counsel had any question as to the precise parameters of the state trial court's rulings, said counsel could either have requested further clarification from the trial court or proceeded to seek to elicit additional expert opinion testimony from Ms. Mockeridge and, thereby, obtained specific rulings from the trial court regarding the admissibility of same. By failing to undertake either course of action, and ignoring the issue completely on direct appeal, petitioner procedurally defaulted a second time on his complaints regarding the trial court's rulings on Ms. Mockeridge's opinion testimony. There can be no disagreement among reasonable jurists that the trial court's exclusion of hearsay testimony by Ms. Mockeridge was a reasonable application of clearly established federal law. *See McGinnis v. Johnson*, 181 F.3d at 693 (holding there was no violation of due process where a defense expert was permitted to testify at the punishment phase of a capital trial regarding his opinion of the defendant's mental state at the time of the offense but was precluded from testifying regarding the specific contents of hearsay statements made by the defendant which helped form the basis for the expert's opinion).

Finally, reasonable jurists cannot disagree regarding the utter lack of arguable merit underlying petitioner's complaints about (1) the admission, without federal constitutional objection, of State Exhibit no. 105–A and (2) the prosecution's objection-less, punishment-phase, closing arguments. Neither the admission of petitioner's epithet-strewn letter nor the prosecution's allusions thereto during closing argument violated any specific federal constitutional right possessed by petitioner nor rendered the punishment

phase of petitioner's trial fundamentally unfair. In view of the overwhelming evidence demonstrating petitioner's propensity for future violence while incarcerated, the horrific details of petitioner's offense, and extraordinarily weak mitigating evidence presented by petitioner at trial, the admission of evidence showing petitioner's professed desire for future gang membership and the prosecution's fleeting references to same during closing argument were but a pair of droplets of water in an ocean of aggravating evidence presented by the prosecution. Neither of those events played any crucial, critical, or highly significant factor in the outcome of petitioner's capital trial. The heinous details of petitioner's crimes and petitioner's complete refusal to personally express any genuine remorse or sincere contrition for his capital offense virtually dictated the jury's answers to the petitioner's capital sentencing special issues. Reasonable jurists could not disagree with regard to the foregoing conclusions. Therefore, petitioner is not entitled to a CoA with regard to any of his claims for relief herein.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's pleadings herein [50] is **DENIED**.

2. Petitioner is **DENIED** a Certificate of Appealability on all of his claims for relief herein.

3. All other pending motions are **DISMISSED AS MOOT**.

4. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

50. Docket entry nos. 6 & 16.